**Christopher Deshon LEDESMA,
Appellant,**

v.

**The STATE of Texas, State.**

No. 2–98–296–CR.

Court of Appeals of Texas,
Fort Worth.

April 29, 1999.

Gary Taylor, Austin, for Appellant.

Barry L. Macha, Crim. Dist. Atty., John W. Brasher, Asst. Crim. Dist. Atty., Ed Lane, Asst. Crim. Dist. Atty., Wichita Falls, for Appellee.

Panel A: CAYCE, C.J., LIVINGSTON, and HOLMAN, JJ.

## OPINION

DIXON W. HOLMAN, Justice.

This is a murder case. Appellant Christopher Deshon Ledesma, known as Christopher Molina, was indicted for using a deadly weapon, a firearm, to murder Chester Ladilik. A jury found him guilty and sentenced him to 99 years in prison. His appeal presents issues that challenge the trial court's denial of his special plea of

double jeopardy, the factual sufficiency of the evidence, the qualifications of the forensic laboratory supervisor who testified as an expert for the State, the trial court's denial of Appellant's motion to quash his indictment, and denial of his motion for new trial. Finding no reversible error, we affirm the trial court's judgment.

## DOUBLE JEOPARDY

The case was called for trial, voir dire was held, and a jury was selected and seated. The next morning, before anything else happened in the trial, juror James Looney informed the judge he could not serve on the jury. The judge quickly convened a hearing out of the presence of the other jurors and Looney testified under oath about his unwillingness to continue as a juror. The hearing began with the court asking him why he could not serve on the jury. Mr. Looney narrated some of his personal problems. He also disclosed for the first time that he has hired Appellant's defense attorney as his own attorney in the past, and because of that, was not comfortable being on Appellant's jury. Mr. Looney disclosed that the night before, after he had been sworn as a juror in this case, he tried unsuccessfully to contact the attorney by telephone. And, he said:

I don't feel like I can honestly give a fair and impartial decision in this young man's future and life.

And I also work a lot of Spanish-American people, and I don't know that—that some of them probably know him. And this could even possibly cause some problems with me in the future, depending on the outcome and the settlement of it.

The prosecutor asked only one question, whether Looney could be a fair and impartial juror in this case. Looney answered that he could not. Appellant's attorney posed four questions, none of which asked whether Mr. Looney could be fair and impartial as a juror in the case. When specifically asked by the court to suggest a less drastic alternative than a mistrial, nei-

ther the prosecutor nor the defense attorney had a suggestion. The court then ended the hearing:

The court finds at this time that there is a manifest necessity for a mistrial, and I find that the ends of public justice would be defeated if I did not declare a mistrial at this time, and that there are no less drastic alternatives in which I can proceed at this time. And the court at this time does declare a mistrial.

*Hearing no objection,* that will be the end of these proceedings. [Emphasis added].

When Appellant's case was again called for trial approximately three months later, a new venire was convened, and Appellant filed a special plea of double jeopardy. The trial court denied it that day.

On appeal, Appellant asserts that his retrial is barred by the doctrine forbidding double jeopardy. He argues that despite the trial court's finding of a manifest necessity for a mistrial, the court failed to first consider any reasonable alternatives to a mistrial. We will review the trial court's finding of manifest necessity for a mistrial by applying an abuse of discretion standard. *See Arizona v. Washington,* 434 U.S. 497, 509–14, 98 S.Ct. 824, 832–35, 54 L.Ed.2d 717 (1978); *Ex parte Little,* 887 S.W.2d 62, 66 (Tex.Crim.App.1994); *Ex parte Williams,* 870 S.W.2d 343, 346 (Tex.App.—Fort Worth 1994, pet. ref'd). A mistrial ordinarily requires the balancing of two competing interests: the defendant's right to have the trial completed, and the public's interest in fair trials designed to end in just judgments. *See Ex parte Homann,* 780 S.W.2d 933, 935 (Tex. App.—Austin 1989, no pet.).

We begin with the principle that when a mistrial is granted without the defendant's consent, double jeopardy bars a retrial unless there was manifest necessity for the mistrial. *See Ex parte Little,* 887 S.W.2d at 66. We find no precise definition of the term "manifest necessity" in existing case law. Perhaps, like beauty,

it appears in the eyes of the beholder. *See Brown v. State*, 907 S.W.2d 835, 839 (Tex. Crim.App.1995). For at least 175 years, America's courts have had the sound discretion to discharge a jury before it has reached a verdict whenever a court concludes, after considering all of the circumstances, that there is a manifest necessity to declare a mistrial to prevent the ends of public justice from being defeated. *See United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824); *Harrison v. State*, 788 S.W.2d 18, 22 (Tex.Crim.App. 1990).

■ However, a trial judge's discretion to declare a mistrial on grounds of manifest necessity is limited to "very extraordinary and striking circumstances." *See Downum v. United States*, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963); *Brown*, 907 S.W.2d at 839. Not only is "necessity" the operative word, but there must be a "high degree" of necessity that the initial trial come to a premature end. *See Arizona*, 434 U.S. at 516, 98 S.Ct. at 835. And before declaring a mistrial, the trial court must give adequate consideration to the defendant's right not to be subjected to double jeopardy. *See Torres v. State*, 614 S.W.2d 436, 442 (Tex.Crim.App. [Panel Op.] 1981). Before granting a mistrial on grounds of manifest necessity, a trial court must determine whether alternative courses of action are available and, if so, choose one that is less drastic than a mistrial. *See Brown*, 907 S.W.2d at 839. The trial court's objective in those circumstances is to choose the alternative that best preserves the defendant's right to have the trial completed before a particular tribunal, that is, the jury that has already been seated. *See id.*

■ Nevertheless, a trial judge who declares a mistrial need not expressly state on the record the considerations that were given to less drastic alternatives, provided the record adequately discloses the basis for mistrial. *See Arizona*, 434 U.S. at 516–517, 98 S.Ct. at 836; *Harrison*, 788

S.W.2d at 22; *Torres*, 614 S.W.2d at 442. As the reviewing court, we must determine whether the trial judge acted irrationally or irresponsibly, and whether the mistrial order reflects the exercise of sound discretion. *See id.* Moreover, if the record shows that the trial judge exercised sound discretion in finding a manifest necessity for a retrial, the judge's sua sponte declaration of a mistrial is not incorrect just because the reviewing court might have ruled differently. *See Arizona*, 434 U.S. at 514–516, 98 S.Ct. at 834–35; *Harrison*, 788 S.W.2d at 22.

■ Aside from the issue of whether a manifest necessity for a mistrial existed, the State contends that because Appellant did not object to the court's finding and declaration of mistrial at the October 28, 1997 hearing, he impliedly consented to it. We agree. A defendant who does not object to a declaration of mistrial, despite an adequate opportunity to do so, has impliedly consented to the mistrial. *See Torres*, at 441–42 (citing *Gori v. U.S.*, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961)). Appellant had the opportunity to object but did not. The trial judge heard the unwilling juror's sworn testimony that he could not be fair and impartial in Appellant's trial. After considering the factual circumstances facing the trial court at that moment, the judge was unable to think of an alternative less drastic than to declare a mistrial. The judge asked the lawyers for less drastic suggestions, and they had none. When the judge declared a mistrial, Appellant impliedly consented by not objecting.

We conclude that the trial court did not abuse its discretion because it did not act irrationally or irresponsibly in finding a manifest necessity and declaring a mistrial. We overrule Appellant's double jeopardy issue.

## FACTUAL SUFFICIENCY

■ In his second issue, Appellant contends that his conviction is clearly wrong

and unjust because the evidence is factually insufficient to support the jury's verdict. In reviewing the factual sufficiency of the evidence to support a conviction, we are to view "all the evidence without the prism of 'in the light most favorable to the prosecution.'" *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim.App.1996) (citing *Stone v. State,* 823 S.W.2d 375, 381 (Tex.App.— Austin 1992, pet. ref'd, untimely filed)). We may only set aside the judgment if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See id.* In performing this review, we are to give "appropriate deference" to the fact finder. *Id.* at 136. We may not reverse the fact finder's decision simply because we may disagree with the result. *See Cain v. State,* 958 S.W.2d 404, 407 (Tex.Crim.App.1997). Instead, we may find the evidence factually insufficient only where necessary to prevent manifest injustice. *See id.*

Appellant lived with Evalina Gonzales in a house occupied by Evalina's sister, Christina, and other members of Evalina's family. Before Appellant moved in with her, Evalina had known the victim, Chester Ladilik. At the time of his death, Chester and his wife, Latesha Ladilik, were living apart. On the evening of October 8, 1995, while Evalina and other members of the Gonzales family were having a party at their house, Chester drove his car into the driveway. Christina testified that against her wishes, Evalina left the house and got into Chester's parked car. A few seconds later, Christina heard gunshots, ran from the house, saw Appellant shooting a gun into the car at Chester, and saw the car move backward and hit a tree. Christina ran back inside the house, where someone telephoned police.

Police Officer Charles Eipper first heard the gunfire while patrolling in his car about a block away. He immediately drove to the scene, hearing five or six more gunshots while on his way there. When the officer arrived, he saw Chester's car sitting in the street at a "cockeyed" position, its driver's door open. The driver's window glass was shattered, and a person was slumped in the front seat. That person was Chester. The officer radioed for police help. As the officer approached the car, he saw three males and one female near it. One of the males, a Hispanic, was wearing a black and white jacket and black pants, standing beside the open driver's door, facing towards the car with his back to the officer. That man turned, saw the officer, and ran. The officer chased him and saw him jump a chain-link fence at the Gonzales' house. Chasing the man around the house, the officer saw him climb into the house through a window at its southwest corner. The officer tried to climb into the same window, but was unable to do that because of the bulk of his protective vest. He went to the front door of the house, found it open and ran inside to look for the man he had chased. Several other police officers quickly arrived. A short time later, the officer found Appellant, dressed in a black and white jacket and black pants, crouched in a closet. He had blood on his face, hands, and clothes. A female occupant of the house, Cruz Gonzales, told Officer Eipper that she suspected Appellant had a .25–caliber pistol. Appellant was arrested about 30 minutes after Officer Eipper first arrived at the scene of the shooting.

L.J. Kendrick testified that at the time of the shooting she was employed as an "ID tech" by the Wichita Falls police department. During "the early morning hours," after the shooting, the department sent her to the house where it happened. She and police detective Eric Russell looked on the lawn around the house and found a .25–caliber pistol, that was later admitted in evidence as State's exhibit 21. They photographed the gun where they found it in the grass. Then they collected other evidence, including "shells, shell casings ... we collected a gun, there was glass fragments, I believe a broken lens from a rear light on the car, and blood samples from the area and the house."

Kimberly Allen, serology laboratory technician at Southwest Institute of Forensic Sciences, found human blood on the pistol. Tests done by Elizabeth Hendel, a serologist employed by the laboratory, confirmed that the blood on the pistol was human blood. Joni Whitmore, a DNA analyst employed by the laboratory analyzed those blood samples, using Polymerase Chain Reaction (PCR) tests known as DQ Alpha and Polymarker. She determined that those samples matched Appellant's blood type. Judith Floyd is the forensic supervisor at Genescreen, a DNA identity testing laboratory in Dallas. Using the blood found on the pistol, a blood sample from Appellant, and a sample of the victim's blood, she performed DNA tests and concluded that there is a DNA match between Appellant's blood and the blood on the gun. Appellant is Hispanic. Judith Floyd testified that Appellant's specific DNA profile is found in only one of every five-hundred million Hispanics.

Dr. Janis Townsend–Parchman, a forensic pathologist employed by the Southwest Institute of Forensic Sciences, performed an autopsy on the victim's body. She estimated that the gun was fired from a distance between one and three feet from the victim. There were six gunshot wounds in the victim's body, and Dr. Townsend–Parchman opined that two of the wounds were fatal. Four bullets recovered from the victim's body during the autopsy were kept for laboratory examination.

Edard Love testified. He is a firearm and tool mark examiner for the Bexar County Crime Lab in San Antonio. At the Institute of Forensic Science Firearms Section, he examined the .25–caliber pistol (State's exhibit 21) as well as the bullets that were recovered during the autopsy. His purpose was to learn whether those bullets were fired by that pistol. His examination determined that two of the bullets were. He concluded that because the other bullets were not fired by that pistol, more than one gun could have been used to shoot the victim.

■ Plainly, an appellate court may not substitute its own conclusions for those of a jury. *See Clewis*, 922 S.W.2d at 135. Instead, our responsibility is to reverse a jury's findings only if we determine that the jury's verdict is so contrary to the great weight and preponderance of the evidence that the verdict is clearly wrong and unjust. *Id.* After carefully reviewing all of the facts in evidence, we are not persuaded that the jury's verdict is so contrary to the evidence that it is clearly wrong and unjust. Nevertheless, our consideration of the factual sufficiency of the evidence will not be complete until we address Appellant's third and fourth issues, which challenge the qualifications of one of the State's expert witnesses to testify to the jury about some of the scientific evidence the jury heard.

## THE EXPERTS

■ Appellant's third issue is whether the trial judge erred in admitting Judith Floyd's testimony that Appellant's blood and the blood found on the .25–caliber pistol are a DNA match. Appellant reasons that before allowing the jury to hear Judith Floyd testify, the trial court did not fulfill its responsibility to determine that her testimony would be sufficiently reliable and relevant to help the jury. *See Kelly v. State*, 824 S.W.2d 568, 573 (Tex.Crim.App. 1992). Appellant also argues that the trial court did not determine that the probative value of Judith Floyd's testimony would outweigh its prejudicial effect on Appellant's case. *See* Tex.R. Evid. 403.

A witness who will testify as an expert about a scientific matter must be qualified to do so:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Tex.R. Evid. 702. Before allowing Judith Floyd to testify, the trial court's responsibility was to determine whether she was qualified to testify as an expert witness about the DNA match between Appellant's blood and the blood found on the pistol. *See* Tex.R. Evid. 104(a); *Kelly*, 824 S.W.2d at 573. Accordingly, the trial court convened a hearing outside the jury's presence and allowed the lawyers to examine Judith Floyd's qualifications to testify. When the hearing ended, Appellant's counsel objected:

> There is no showing that the procedures complied with state law. There has been no showing that the procedures complied with *state administrative code regulations,* or that the facilities or the parties performing any of the tests have *complied with state law, statutory law or administrative code regulations.* [Emphasis added]

■ In support of his objection, Appellant did not attack the technique Judith Floyd used in the DNA test, nor argue that the requirements of *Kelly* had *not* been satisfied by the hearing out of the jury's presence. Instead, Appellant argued that:

> [I]n order for [Floyd's test results] to be admitted before the jury the test, *if* it's a novel scientific method, must be shown to meet *Kelly* and all the requirements thereunder, *but it must also* be a test that was performed in a laboratory that meets *statutory requirements as well as administrative code requirements,* and that the *parties performing the test must meet those requirements.* [Emphasis added]

The State correctly contends that because Appellant's objection was based on a theory that is separate from the principles of *Kelly*, his objection did not preserve his third issue, a *Kelly* issue.

Regardless, we will address the third issue in the interest of justice. The court of criminal appeals has made clear that in determining the reliability of an expert's proffered testimony, a trial court is not rigidly bound to *Kelly's* seven reliability factors. *See Kelly*, 824 S.W.2d at 573 (holding that the seven are factors a trial court *could* rely on, but trial courts *are not limited* to considering only those factors). A careful review of the qualification hearing's record supports the synopsis in the State's brief of the factors that were established at the hearing: Judith Floyd testified that (1) she was a forensic laboratory supervisor at Genescreen in Dallas; (2) she had been employed there since September 1989; (3) in addition to performing actual casework, she was involved in teaching and training; (4) she had performed a type of DNA testing known as PCR; (5) that the techniques she used in the test done for this case were accepted in the scientific community; (6) that she had testified regarding "PCR DNA" 60 to 70 times; (7) that DNA analysis is deemed valid in the scientific community; (8) that no court had excluded DNA testing based on Genescreen not properly conducting its analysis; (9) that all fifty states had accepted DNA testing in criminal cases; (10) that the procedures Judith Floyd used in the testing for this case were typical of those accepted in the scientific community; (11) that those procedures were performed in accordance with scientific protocol; (12) that laboratories across the country use the technique she used in this case; (13) that DNA technology has been used in criminal cases since 1985; (14) that she had properly performed the test in this particular case; (15) that she is a member of the American Academy of Forensic Science and the Southwestern Technical Working Group on DNA Analysis Methods; (16) that the FBI uses DNA testing and has referred clients to Genescreen. Judith Floyd has a bachelor of science degree in molecular biology.

■ From this evidence, we conclude that the trial court did balance the probative value and relevance of the evidence Judith Floyd would present versus its prejudicial effect on Appellant's case. *See* Tex.R. Evid. 104(a), 403; *Stern v. State*,

922 S.W.2d 282, 287 (Tex.App.—Fort Worth 1996, pet. ref'd). A trial court is not required to announce its balancing process on the record. *Id.* The trial court did not abuse its discretion by admitting Judith Floyd's testimony, and we overrule Appellant's third issue.

 Appellant's fourth issue is coupled to the third. The fourth asserts that because the court heard no proof that Judith Floyd had complied with the statutory standards of Title 37 of the Texas Administrative Code, the court erred by allowing her to testify about the DNA match between Appellant's blood and the blood found on the pistol. That assertion is not persuasive because Genescreen is not a criminal justice or law enforcement agency. Genescreen is a private laboratory. Title 37 of the Texas Administrative Code does not impose its requirements on private laboratories. *See* 37 TEX. ADMIN. CODE § 28 (last modified Dec. 30, 1994), <*http//www.sos.state.tx.us/tac/37/I/28/B/index.html*>. We overrule Appellant's fourth issue.

Having carefully reviewed all of the evidence, we overrule Appellant's second issue that contends the evidence is factually insufficient to support his conviction.

## THE INDICTMENT

 Appellant's fifth issue asserts that the trial court erred by denying his motion to quash his indictment. The record shows that the trial court held a pretrial hearing on January 15, 1998. An express purpose of a pretrial hearing in connection with a felony indictment is to allow the trial court to determine any exceptions the defendant may file challenging the indictment's form or substance. *See* TEX.CODE CRIM. PROC. ANN. art. 28.01, § 1(4) (Vernon 1989). Before the hearing, Appellant did not file a motion to quash. *See id.* art. 28.01, § 2. At the hearing, Appellant did not present a motion to quash the indictment and did not voice any exception to its form or substance.

When trial on the merits began on February 9, 1998, Appellant filed a motion to quash the indictment, and the trial court denied the motion. If a defendant does not object to a defect, error, or irregularity of form or substance in an indictment before the date on which the trial on the merits commences, such complaints are waived. *See* TEX.CODE CRIM. PROC. ANN. Art. 1.14(b) (Vernon 1991); *Satterwhite v. State*, 952 S.W.2d 613, 615 (Tex.App.—Corpus Christi 1997), *aff'd*, 979 S.W.2d 626 (Tex.Crim.App.1998). The jury was seated and sworn on February 9, 1998. That was the date the trial "commenced" with the meaning of article 1.14(b). *See Satterwhite*, 952 S.W.2d at 615; *Hinojosa v. State*, 875 S.W.2d 339, 342 (Tex.App.—Corpus Christi 1994, no pet.) (holding that "trial on the merits commences at the time that the jury is impaneled and sworn"). Because he waived his opportunity to have the trial court consider his motion to quash the indictment, we overrule Appellant's fifth issue.

## MOTION FOR NEW TRIAL

 Appellant's sixth issue challenges the trial court's denial of his motion for new trial. The motion's single ground for a new trial contains twelve words:

New evidence favorable to the accused has been discovered since the trial.

The supporting affidavit of Appellant's trial attorney is attached to the motion:

I am the attorney for the defendant in the above entitled and numbered cause. I have read the foregoing Motion for New Trial and swear that all of the allegations are true and correct.

The trial court overruled the State's objection that because a motion for new trial must be sufficient to put the trial judge on notice that reasonable grounds exist to believe a new trial is warranted, the motion was not sufficiently pled. *See Sandoval v. State*, 929 S.W.2d 34, 36 (Tex.App.—Corpus Christi 1996, pet. ref'd). By making that objection, the State preserved its insufficient pleading argument for our con-

sideration in connection with Appellant's sixth issue in this appeal. *See* Tex.R.App. P. 33.1(a); *Hampton v. State,* 838 S.W.2d 337, 340 (Tex.App.—Houston [1st Dist.] 1992, no pet.).

 We review the denial of a motion for new trial based on newly-discovered evidence under an abuse of discretion standard. *See Carmell v. State,* 963 S.W.2d 833, 837 (Tex.App.—Fort Worth 1998, pet. ref'd). The record must reflect that (1) the newly-discovered evidence was unknown to the movant at the time of trial; (2) the movant's failure to discover the evidence was not due to his want of diligence; (3) the evidence was admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the evidence was probable and true and would probably bring about a different result in another trial. *Id.* at 837–38.

At the guilt-innocence phase of the trial, Edard Love, a State's expert witness, testified that, in his opinion, the shots that killed Chester Ladilik may have been fired from more than one .25–caliber pistol. The trial court convened a hearing on Appellant's motion for new trial. There, his trial attorney admitted that during the trial he and Appellant were aware that Cruz Gonzales had taken a .25–caliber pistol to a gun repair shop in Wichita Falls less than two weeks before the murder. Appellant's trial attorney told the police about it before the trial, but they did not find that pistol at either of the two gun repair shops in the city. Cruz Gonzales told police she did not have the gun or know where it was. Appellant did not ask the trial court for a continuance to allow more time to try to locate the weapon before the trial. When the motion for new trial was heard, Appellant's trial attorney suggested to the court that in addition to being shot by the .25–caliber pistol that is State's exhibit 21, perhaps Chester Ladilik was also shot by the other .25 caliber pistol that has not been recovered. The theory was that perhaps Gonzalo Gonzales, son of Cruz Gonzales, was the second shooter.

 The State argues persuasively that because Appellant suspected Gonzalo Gonzales was the second shooter, that theory was available at trial for Appellant's defense. The evidence at trial directly linked Appellant and the .25–caliber pistol that is State's exhibit 21. The State insists that finding a second shooter or a second .25–caliber pistol before Appellant's trial would not have lessened Appellant's culpability for the murder of Chester Ladilik. We agree. Appellant did not demonstrate to the trial court that he was unaware of the "newly-discovered" evidence at the time of trial. Nor did Appellant demonstrate that a second .25–caliber pistol would have been admissible even if it had been recovered. Finally, Appellant did not demonstrate that the result of his trial would have been different even with proof that the victim was simultaneously shot with two guns, one held by Appellant and one held by a second shooter.

We conclude that the trial court did not abuse its discretion by denying Appellant's motion for new trial. We overrule Appellant's sixth issue.

## CONCLUSION

Having carefully considered all of the evidence in this case and having overruled each of Appellant's issues, we affirm the trial court's judgment.