

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-19-00072-CR

CHARLES CLYDE INGRAM, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 173rd District Court
Henderson County, Texas
Trial Court No. CR16-0711-173

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Stevens

MEMORANDUM OPINION

A Henderson County jury convicted Charles Clyde Ingram of indecency with a child by sexual contact. *See* TEX. PENAL CODE ANN. § 21.11. Ingram was sentenced to seven years' imprisonment and was ordered to pay $8,156.25 in attorney fees. On appeal, Ingram argues that (1) double jeopardy barred his post-mistrial re-trial and (2) the trial court erred in assessing $8,156.25 in court-appointed attorney fees against him.[1]

Because a double-jeopardy violation is not apparent on the face of this record, we find that Ingram has failed to preserve his first issue for our review. We sustain Ingram's second point of error and modify the trial court's judgment by deleting the assessment of attorney fees. As modified, we affirm the trial court's judgment.

## I.     Ingram's Double-Jeopardy Complaint Is Unpreserved

### A.     Factual Background

The State's charge alleging that Ingram committed indecency with O.C., a child, was consolidated for trial with a charge of aggravated sexual assault of a different child victim. At trial, O.C. testified about the details of Ingram's sexual contact with him. During cross-examination, Ingram asked, "And this isn't the first time that you've accused somebody of sexually assaulting you, correct?" The State objected under Rule 412, which generally prohibits evidence of specific instances of a victim's prior sexual conduct in sexual assault or aggravated assault

---

[1]Originally appealed to the Twelfth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We follow the precedent of the Twelfth Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

cases. *See* TEX. R. EVID. 412(a). It also argued that the response would be irrelevant and "highly prejudicial" and that it constituted "inappropriate impeachment."

When asked to explain how the prior allegation was relevant, Ingram responded that O.C. made an allegation of sexual abuse against his babysitter during the forensic interview that seemed outlandish and must have been false because it was not prosecuted. The State argued,

> If [Ingram's] going to impeach him down this line, then I think we have a right to reestablish him by talking about all the sexual assaults that this defendant has done to this child because they're going to make it look like he's just making false accusations just because someone didn't prosecute him . . . . And I don't think [Ingram] can have it both ways, go down the road that way and not let us talk about all of the acts this defendant's done.

As a result of this discussion, Ingram agreed to withdraw the unanswered question. Even so, the State moved for a mistrial because the question had prejudiced the jury.

Ingram argued that a mistrial was unnecessary because any error would be cured if the trial court instructed the jury to disregard the question. The trial court found that Rule 412 did not apply and denied the State's motion for a mistrial.[2] The court noted, however, that "just because somebody has been a victim of a previous sexual assault doesn't mean that they're not a victim of this sexual assault" and ruled that the State could play O.C.'s forensic interview, which was authenticated by Sheila Davis, program director of the local Children's Advocacy Center (CAC). Ingram argued that the CAC interview was hearsay that should not be played for the jury, prompting the following discussion:

---

[2]Ingram also argued that the "motive or bias" exception to Rule 412, which generally prohibits evidence of specific instances of a victim's prior sexual conduct in sexual assault or aggravated assault cases, applied. The trial court correctly ruled that Rule 412 does not apply to trials of charges of indecency with a child. *Reyna v. State*, 168 S.W.3d 173, 176 (Tex. Crim. App. 2005).

3

[BY THE STATE]: . . . [T]he whole reason why this is coming in is for completion of questions that the defense has opened the door to. . . . That's why it's coming in. It's either -- in my opinion, it's either declare the mistrial or let this tape in based on the defendant's errors.

THE COURT: Well, . . . [m]y idea about it is, is to me it's just basically if somebody asks -- cherry-picks questions from an interview or cherry-picks things from an interview and asks questions about them in front of the jury, then the fair thing to do is to play the interview. In other words, it's the old -- age-old principle of opening the door.

. . . .

. . . [T]he Court believes that the most -- the most fair thing to do at this point -- it's more fair to allow [the CAC interview] to come in and be published to the jury than it is either to instruct the jury to disregard the question or to give the jury no instruction and let the witness answer it with no further regard to the interview itself. In other words, I don't think it's fair to instruct the jury to disregard the question and not play the interview, and I don't think it's fair to let the witness answer the question and not play the interview. So I guess what I'm saying is, I think the most fair thing to do at this point under these circumstances is to just let you cross-examine [O.C.] all you want to about that interview and anything else, and then we'll play the interview. And so that's my ruling.

During the discussion, Ingram learned that Davis would be out of town during trial and was going to be excused by the trial court. Ingram argued that, if the video was to be played, Davis' presence was required for purposes of cross-examination and objected to Davis being excused. After another argument about whether the State should be permitted to play the CAC interview and Ingram's need for Davis' presence at trial, the trial court decided to have a meeting in chambers.

The record does not indicate the length of the in-chambers meeting. After it was over, the trial court said it would grant a mistrial. There was no objection on the record to the mistrial. The next day, the trial court asked the parties if there was "anything else to put on the record." While

4

Ingram indicated that he had filed a motion to obtain a transcription of O.C.'s testimony, he stated that there was nothing to put on the record "with respect to the mistrial."

Ingram was later tried and convicted for the charge against O.C. For the first time on appeal, he argues that the re-trial violated double-jeopardy principles.

**B.    Preservation of Error**

The State argues that Ingram did not preserve this point of error for our review. "Failure to present a timely and specific objection, request, or motion to the trial court for a ruling results in waiver or forfeiture of the right to present the claim on appeal." *Stinecipher v. State*, 438 S.W.3d 155, 159 (Tex. App.—Tyler 2014, no pet.) (citing TEX. R. APP. P. 33.1; *Mendez v. State*, 138 S.W.3d 334, 341–42 (Tex. Crim. App. 2004)). The preservation requirement

> (1) ensures that the trial court will have an opportunity to prevent or correct errors, thereby eliminating the need for a costly and time-consuming appeal and retrial; (2) guarantees that opposing counsel will have a fair opportunity to respond to complaints; and (3) promotes the orderly and effective presentation of the case to the trier of fact.

*Id.* (citing *Gillenwaters v. State*, 205 S.W.3d 534, 537 (Tex. Crim. App. 2006)).

"A defendant has the burden to 'preserve, in some fashion' a double jeopardy objection at the trial court level." *Id.* (quoting *Gonzalez v. State*, 8 S.W.3d 640, 642 (Tex. Crim. App. 2000)). "But a double jeopardy claim may be raised for the first time on appeal when (1) the double jeopardy violation is clearly apparent on the face of the record, and (2) when enforcement of the usual rules of procedural default serves no legitimate state interests." *Id.* (citing *Garfias v. State*,

424 S.W.3d 54, 58 (Tex. Crim. App. 2014) (citing *Gonzalez*, 8 S.W.3d at 643)).[3] Because Ingram did not raise the issue of double jeopardy with the trial court, "we must therefore first determine whether the undisputed facts show that a double jeopardy violation is clearly apparent in this case." *Garfias v. State*, 424 S.W.3d 54, 58 (Tex. Crim. App. 2014); *see Stinecipher*, 438 S.W.3d at 160.

### C.    When Double Jeopardy Bars Re-Trial After a Mistrial

"Generally a criminal defendant may not be put in jeopardy by the State twice for the same offense." *Pierson v. State*, 426 S.W.3d 763, 769 (Tex. Crim. App. 2014) (citing U.S. CONST. amend. V; *Hill v. State*, 90 S.W.3d 308, 313 (Tex. Crim. App. 2002)). "The prohibition on double jeopardy was extended to the states by the United States Supreme Court through the Fourteenth Amendment." *Id.* "In cases tried before a jury, a defendant is placed in jeopardy when the jury is empaneled and sworn, and 'because jeopardy attaches before the judgment becomes final, the constitutional protection also embraces the defendant's "valued right to have his trial completed by a particular tribunal."'" *Id.* (quoting *Arizona v. Washington*, 434 U.S. 497, 504 (1978) (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949))).

"[T]here are two exceptions when a criminal defendant may be tried a second time without violating double-jeopardy principles if the prosecution ends prematurely as the result of a mistrial: (1) if the criminal defendant consents to retrial or (2) there was a manifest necessity to grant a mistrial." *Id.* at 769–70 (citing *Ex parte Garza*, 337 S.W.3d 903, 909 (Tex. Crim. App. 2011);

---

[3]The continued viability of the error preservation rule espoused in *Gonazalez* has been questioned in concurring and dissenting opinions in *Ex parte Marascio*, but has not been overruled. *Ex parte Marascio*, 471 S.W.3d 832, 837, 840, 850–51 (Tex. Crim. App. 2015) (per curiam) (Keasler, J., concurring, Hervey and Yeary, JJ., joining) (Richardson, J., concurring, Newell, J., joining) (Yeary, J., concurring, Keasler, J., joining) (Meyers, J., dissenting) (Johnson, J., dissenting).

*Washington*, 434 U.S. at 505–06). "These exceptions are recognized because valid reasons exist for a jury to be discharged before the conclusion of a trial and not all of those reasons 'invariably create unfairness to the accused[.]'" *Id.* at 770 (alteration in original). "Thus, a defendant's right to have his trial conducted by a particular tribunal 'is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury.'" *Id.* (quoting *Washington*, 434 U.S. at 505).

"The initial burden is on the defendant 'to [g]o forth with evidence in support of [an] allegation of former jeopardy.'" *Ex parte Garrels*, 559 S.W.3d 517, 524 (Tex. Crim. App. 2018) (first alteration in original) (quoting *McClendon v. State*, 583 S.W.2d 777, 780 (Tex. Crim. App. [Panel Op.] 1979)). "[I]n order to satisfy this *prima facie* burden, the defendant need only establish 'that []he was tried for the same offense after a mistrial.'" *Id.* (quoting *Hill*, 90 S.W.3d at 313). Once that burden is met, as it is in Ingram's case, "the burden shifts to the State 'to [either] prove that appellant consented to' the order terminating her first trial," *Id.* (quoting *McClendon*, 583 S.W.2d at 780–81), or that there was "a 'manifest necessity' (also referred to as a 'high degree' of necessity) for the mistrial." *Pierson*, 426 S.W.3d at 770.

### D.     The Consent Exception

The first exception permitting retrial after mistrial without violating double-jeopardy principles occurs when the defendant consents to a retrial. The State argues that Ingram consented to the mistrial. "Where a defendant consents to a mistrial . . . , the 'manifest necessity' doctrine does not come into play." *Harrison v. State*, 767 S.W.2d 803, 806 (Tex. Crim. App. 1989). When the issue of consent is raised, it must be decided before the issue of manifest necessity. *Id.*

"[C]onsent need not be expressed, but may be implied from the totality of circumstances attendant to a declaration of mistrial." *Garrels*, 559 S.W.3d at 523 (quoting *Torres v. State*, 614 S.W.2d 436, 441 (Tex. Crim. App. [Panel Op.] 1981)). Consent may not be implied unless the record shows that the defendant "was 'given an adequate opportunity to object,'" but a finding of implied consent may not be "based solely on the lack of an objection." *Id.* (quoting *Torres*, 614 S.W.2d at 441–42); *but see Ex parte Montano*, 451 S.W.3d 874, 878–80 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) ("A defendant who does not object to a declaration of mistrial, despite an adequate opportunity to do so, has impliedly consented to the mistrial.") (citing *Torres*, 614 S.W.2d at 441; *Ledesma v. State*, 993 S.W.2d 361, 365 (Tex. App.—Fort Worth 1999, pet. ref'd)).

A review of the record shows that Ingram at first objected to the mistrial, withdrew his question, and asked the trial court to instruct the jury to disregard the question as a lesser alternative to granting a mistrial. The trial court agreed with Ingram that a mistrial was not required but concluded that it would allow the State to play the CAC interview to cure any impression made on the jury by the tone of Ingram's question that O.C.'s prior allegation was false. The State argues that, at that point, Ingram consented to the mistrial because he did not want the CAC interview played in front of the jury. The record supports this argument.

Ingram argued vehemently that he had not opened the door to the admission of the CAC interview. After much argument between Ingram and the State, the trial court held a meeting in chambers with both parties. After the meeting, without objection, the trial court announced on the record that it would declare a mistrial the following morning. After that hearing, but before the declaration of a mistrial, Ingram filed a motion asking for a transcription of O.C.'s testimony but

filed no objection to the mistrial. On the following morning, the trial court said it "intend[ed] to order a mistrial" and asked the parties if there was "anything else to put on the record." Ingram stated, "Not with respect to the mistrial."

After reviewing the totality of the circumstances, we find that a double-jeopardy violation is not apparent on the face of the record because it also shows that Ingram implicitly consented to the mistral. Ingram had many opportunities to object in open court, in chambers, and by written motion, but failed to do so. He also had a strategic incentive to consent to the mistrial—preventing the jury from seeing the CAC interview. Under these facts, the record supports the State's argument that Ingram's consent was implied. *See Montano*, 451 S.W.3d at 879–80; *Ledesma v. State*, 993 S.W.2d 361, 365 (Tex. App.—Fort Worth 1999, pet. ref'd); *Garner v. State*, 858 S.W.2d 656, 659 (Tex. App.—Fort Worth 1993, pet. ref'd). As a result, the undisputed facts related to the issue of consent do not show that a double-jeopardy violation is clearly apparent here. *See Garfias*, 424 S.W.3d at 58.

We also find that enforcement of the usual rules of procedural default serve legitimate state interests here. Had Ingram raised a double-jeopardy violation, he would have been required to challenge the evidence showing his consent. This would have provided the parties and the trial court with the opportunity to develop a record of what was discussed in chambers and whether Ingram had expressly consented to the mistrial. Since the issue of consent is disputed and the

9

record supports a finding of implied consent, we find that Ingram needed to preserve any alleged error by raising the double-jeopardy issue with the trial court. *See id.*[4]

### E. Manifest Necessity

As for the second exception permitting post-mistrial retrial without violating double-jeopardy principles, "[a] trial court's decision to declare a mistrial is limited to the inquiry of if there was a 'manifest necessity' to grant a mistrial." *Pierson*, 426 S.W.3d at 770 (citing *Garza*, 337 S.W.3d at 909). "As an appellate court, it is our function to review the record and determine if the trial judge exercised 'sound discretion' when granting a mistrial." *Id.* (quoting *Washington*, 434 U.S. at 514). And "a trial court abuses its discretion if it declares a mistrial 'without first considering the availability of less drastic alternatives and reasonably ruling them out[,]' although the basis for the mistrial need not be expressly articulated in the record." *Id.* (alteration in original) (quoting *Garza*, 337 S.W.3d at 909).

The State moved for mistrial after Ingram asked O.C., "And this isn't the first time that you've accused somebody of sexually assaulting you, correct?" The trial court granted a mistrial because it determined that Ingram's question was improper and may have influenced the jury. "[T]he Supreme Court has stated that 'the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment.'" *Id.* (quoting *Washington*, 434 U.S. at 511). For this reason, "when a trial judge's

---

[4]Out of an abundance of caution, and as result of the language in the concurring and dissenting opinions of *Marascio*, we will also analyze the issue of manifest necessity.

10

decision to grant a mistrial is based on the risk of juror bias, that ruling is entitled to 'great deference,' regardless of whether the complained of conduct took place during opening arguments or took the form of a question on cross-examination." *Id.* at 774.

In examining whether Ingram's question caused a manifest need to declare a mistrial, we are guided by the Texas Court of Criminal Appeals' decision in *Pierson*. As in this case, Pierson was tried for indecency with a child and aggravated sexual assault of a child. *Id.* at 765. After the victim's direct examination, the defense's first question "on cross-examination was, 'Did you also make an allegation that [Appellant] did these same things to his own daughter?'" *Id.* The State objected to the question before it was answered, and the trial court granted the State's request for a mistrial after a hearing. *Id.* at 765–66. This Court affirmed the trial court's decision of manifest necessity. *Pierson v. State*, 398 S.W.3d 406, 417 (Tex. App.—Texarkana 2013), *aff'd*, 426 S.W.3d 763.

In affirming our decision, the Texas Court of Criminal Appeals rejected Pierson's arguments that (1) "there was just simply a question asked, did you make this allegation. There was no inference o[f] whether it was true or not true" and (2) that, as a result, (a) "there was no manifest necessity to grant the State's request for mistrial because the State was not harmed by the question" and (b) "there were less drastic means to remedy the problem than granting a mistrial." *Pierson*, 426 S.W.3d at 768 (alteration in original). The court reasoned that it was Pierson's burden to prove the admissibility of the evidence he sought to introduce by his question, but that he failed to do so under Rule 608(b), which discusses when a witness's character for truthfulness may be impeached. *Id.* at 770, 772.

11

As relevant, Rule 608(b) provides that "a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct in order to attack or support the witness's character for truthfulness." TEX. R. EVID. 608(b). Ingram argues that Rule 613 provided an exception to Rule 608(b) because he planned on using the evidence solicited to impeach O.C.'s bias or motive. *See Pierson*, 398 S.W.3d at 415 (discussing Rule 613's exception to Rule 608(b)). Yet Ingram's substantive explanation to the court showed he merely wished to establish that the accusation was allegedly false. We previously found that "evidence of [an] allegedly false allegation was not admissible to prove the child's propensity to lie," because "evidence of prior false allegations of molestation are normally not admissible to prove" such a propensity. *Id.*

Here, just as in *Pierson*, Ingram's question insinuated that the child victim made a false allegation. *See Pierson*, 426 S.W.3d at 768–69. The explanation provided by Ingram about the admissibility of the evidence he sought to establish mirrors the explanation provided by Pierson. Just as the Texas Court of Criminal Appeals concluded in *Pierson*, we likewise find that,

> [u]nder these circumstances, the trial court was free to conclude that Appellant failed to carry his burden, as proponent of the evidence, to show that the question was anything more than a prelude to impeachment on a collateral matter and an impermissible attempt to attack the complaining witness's general credibility with evidence of specific instances of conduct. . . . [T]he trial court did not abuse its discretion when it excluded Appellant's cross-examination question as impermissible.

*Id.* at 772.

The record also shows that the trial court ruled out less drastic alternatives than a mistrial. *Id.* at 775. Finding that an instruction to disregard would be insufficient given the impression left on the jury as a result of the question, the trial court proposed allowing the State to play the CAC

12

interview. The record shows that that proposal was not accepted by Ingram. After considering the arguments about its proposed cure, the trial court determined that its only choice was to declare a mistrial. Because the question in *Pierson* was much like the question Ingram asked here, we adopt the Texas Court of Criminal Appeals' reasoning and conclude "that the trial court exercised sound discretion in determining" that the proposed lesser alternatives were not "viable alternative[s] to the granting of a mistrial." *Id.* As a result, we find error is not apparent on the face of the record because "the trial court was within its discretion to declare a mistrial based on manifest necessity due to the actions of defense counsel." *Id.*

### F. Conclusion

We conclude that a double-jeopardy violation is not clearly apparent from the face of this record but cannot conclude that the usual rules of preservation would serve no legitimate interest in this appeal. *See Garfias*, 424 S.W.3d at 64; *Gonzalez*, 8 S.W.3d at 643; *Stinecipher*, 438 S.W.3d at 162. As a result, the rules of error preservation should not be suspended, and we conclude that Ingram forfeited his double-jeopardy complaint by failing to raise an objection with the trial court. *See Garfias*, 424 S.W.3d at 64; *Gonzalez*, 8 S.W.3d at 643.

### II. We Delete the Assessment of Attorney Fees Because Ingram Is Indigent

Because the trial court found Ingram indigent, he was presumed to remain indigent absent proof of a material change in his circumstances. *See* TEX. CODE CRIM. PROC. ANN. arts. 26.04(p), 26.05(g) (Supp.); *Walker v. State*, 557 S.W.3d 678, 689 (Tex. App.—Texarkana 2018, pet. ref'd). Even so, the trial court, which also found Ingram indigent after trial for purposes of appeal, assessed $8,156.25 in attorney fees against him.

Under Article 26.05(g) of the Texas Code of Criminal Procedure, a trial court has the authority to order the reimbursement of court-appointed attorney fees only if "the judge determines that a defendant has financial resources that enable the defendant to offset in part or in whole the costs of the legal services provided . . . including any expenses and costs." TEX. CODE CRIM. PROC. ANN. art. 26.05(g). "[T]he defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the propriety of ordering reimbursement of costs and fees" of legal services provided. *Armstrong v. State*, 340 S.W.3d 759, 765–66 (Tex. Crim. App. 2011) (alteration in original) (quoting *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010)). Since there is no finding of the ability of Ingram to pay them, the assessment of the attorney fees was erroneous. *See Cates v. State*, 402 S.W.3d 250, 252 (Tex. Crim. App. 2013); *see also Mayer v. State*, 309 S.W.3d 552 (Tex. Crim. App. 2010); *Martin v. State*, 405 S.W.3d 944, 946–47 (Tex. App.—Texarkana 2013, no pet.).

"Appellate courts 'have the authority to reform judgments and affirm as modified in cases where there is non reversible error.'" *Walker*, 557 S.W.3d at 690 (quoting *Ferguson v. State*, 435 S.W.3d 291, 294 (Tex. App.—Waco 2014, pet. struck) ("comprehensively discussing appellate cases that have modified judgments")). We sustain Ingram's second point of error and modify the trial court's judgment by deleting the assessment of $8,156.25 for attorney fees.

14

**III.**   **Conclusion**

We modify the trial court's judgment by deleting the assessment of $8,156.25 for attorney

fees.  As modified, we affirm the trial court's judgment.


                                                    Scott E. Stevens
                                                    Justice


Date Submitted:      November 26, 2019
Date Decided:        December 12, 2019

Do Not Publish