

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00224-CR

_____

EX PARTE LYLE D. HUDDLESTUN, JR.

On Appeal from the 336th District Court
Fannin County, Texas
Trial Court No. CR-14-25176

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Burgess

# O P I N I O N

In early September 2015, the State tried Lyle D. Huddlestun, Jr., on two indictments, each of which alleged one count of sexual assault of a child. On the second day of the State's case-in-chief, the trial court granted the State's request for a mistrial. When the State made known its intent to re-try Huddlestun, Huddlestun filed an application for writ of habeas corpus, claiming any subsequent prosecution of the same indictments was barred by double jeopardy. The trial court denied this application, and Huddlestun appeals. After applying the great deference standard required by *Arizona v. Washington*, 434 U.S. 497, 505 (1978), we find that the trial court did not abuse its discretion in deciding that a mistrial was manifestly necessary and that no less drastic alternatives to mistrial existed. Accordingly, we affirm the trial court's ruling.

## I.    Factual Background

### A.    The Relationship of the Parties and the Origin of the Allegations Against Huddlestun

From 2007 to 2009, Huddlestun was the youth pastor for the Boyd Baptist Church of Bonham, Texas. As youth pastor, Huddlestun worked with a group of several young men, whom he frequently had over to his home for sleepovers. During the sleepovers, Huddlestun's wife was usually present, and the boys slept in an upstairs bedroom. The boys played video games, participated in Bible studies, and worked on educational business projects. David,[1] the complaining witness in this case, was one of the boys who stayed at Huddlestun's sleepovers.

---

[1]The State used a pseudonym in the indictment, but then waived the pseudonym at trial. However, because the complaining witness was a minor at the time of the alleged events, we employ a pseudonym in this opinion. *See* TEX. R. APP. P. 9.10.

2

The charges in this case arose in October 2013 when David, then eighteen, alleged that Huddlestun had forced him to engage in anal and oral sex multiple times during Huddlestun's time in Bohnam when David was fourteen years old. According to the testimony, David first made the allegations after he began dating Kendall Smith during college. At one point, Smith observed images of male homosexual activity on David's telephone and asked David about them. Smith testified that David became emotional and cried for hours, expressing difficulty reconciling his interests with his Christianity. Smith said David was ashamed and embarrassed by what had happened between him and Huddlestun and that he continued to be affected by those events.

On cross-examination, Smith testified about her statement to law enforcement officers. In her statement, Smith discussed David's sexuality and the homosexual pornography she found on his telephone. She also indicated that David may have been molested by someone in addition to Huddlestun. When asked who this other person was, Smith testified, "He never said the other person, but he insinuated that it took place with [Huddlestun] and other people." On redirect examination, Smith testified that David only insinuated that others were involved, but that he directly stated Huddlestun was involved. She also testified that David said the pornography on his telephone was partly due to what happened between him and Huddlestun, that David was affected by it, and that it still affected him as of the date of trial.

### B. The Procedural History

#### 1. The State's Pretrial Motion in Limine

The case went to trial on July 13, 2015, but ended in a mistrial after voir dire at Huddlestun's request. In September 2015, the case went to trial again. Before trial, the State filed

3

a motion in limine to require the parties to approach the bench prior to mentioning "[e]xtraneous offenses or bad acts allegedly committed by any witnesses, including the victim," and the "criminal history of the Defendant or any witness testifying on behalf of the Defendant." At a pretrial conference, the defense announced that it had no opposition to the State's in limine motion. Specifically, Huddlestun said, "Pay rates, yeah, we're not going to be cross-examining any officers about what they get paid. We don't have any objection to their motion in limine whatsoever. It's all standard stuff . . . based on the rules of evidence."[2]

### 2. Huddlestun's Counsel Violated the Pretrial Limine Order During Opening Statements, and the Trial Court Granted a Second Order In Limine During Trial

Nevertheless, in opening statements later that same day, Huddlestun's attorney told the jury, "[O]h, one other huge important fact. The facts are going to show that one of the children that were [sic] in that room, [James,[3] was a] registered sex offender." The State objected and asked for an "order in limine" until a hearing could be held on the admissibility of that information, but did not ask for a hearing at that time. The trial court instructed the defense, "Don't talk about it. We'll have a hearing outside the presence of the jury, because I can't hardly hear you, and I'm not

---

[2]When the State presented the pretrial motion in limine, the State did not mention criminal histories of witnesses or the victim's sexual history; rather, it summarized the motion as addressing "nonprosecution statements, speaking objections, alleged statements, any kind of statements regarding alleged corruption, or pay rates. There's a list of items that [the State] had presented." Those matters were found on the first page of the motion in limine. The second page contained items regarding the sexual history, extraneous acts, and criminal histories of witnesses. Nevertheless, Huddlestun never asserted at trial or on this appeal that he was unaware of those matters in the State's motion in limine.

[3]Because this person was a juvenile at the time of the events, we employ a pseudonym. *See* TEX. R. APP. P. 9.10.

4

really sure how that fits in.  So, just don't go into that anymore."  The State also asked the trial court to instruct the jury to disregard the comment, but the trial court denied that request.

### 3. Huddlestun Violated the Second Limine Order During Cross-Examination of State's Witness Jacob Barker

Later that day, Huddlestun cross-examined Fannin County Deputy Sheriff Jacob Barker, who had been the supervisor of the Fannin County Sheriff's Office's Criminal Investigations Division at the time of the Huddlestun investigation.  Continuing with a theme that he had pursued through three other law enforcement witnesses, Huddlestun challenged the thoroughness of the State's investigation.  Barker testified that he had driven with David around neighborhoods in Bonham until David identified the house in which Huddlestun had lived and hosted the youth group sleepovers.  However, Barker admitted that no law enforcement officer had visited the house where the assaults allegedly happened, that no attempt had been made to obtain a search warrant to search the premises, and that no officer had even asked the current property owner for permission to view the site.  Barker and the State's other law enforcement witnesses explained that several years had passed since the alleged assaults took place and that there was little chance of finding usable evidence.  Yet, Huddlestun suggested by his questioning that a search would have at least revealed that the room in which the boys slept was very small, that it contained three beds and a futon, and that it was unlikely that any sexual activities could have occurred without the other young men hearing it.

Huddlestun then asked Barker if he knew that James, who was one of the other boys who had been present during some of the sleepovers, had given a statement to someone in law enforcement.  Barker said he was not aware of this statement.  Counsel then asked, "In a sexual-

5

assault investigation, if one of the witnesses that was in the room at the time of the alleged offense was a sex offender, that's something that you would want to investigate." The State objected to that question, and the trial court conducted a hearing outside the jury's presence to decide the admissibility of that evidence, which was covered by the trial court's pretrial order granting the State's motion in limine and the trial court's second limine order issued during opening statements.

### 4. The Evidentiary Hearing and the State's First Motion for Mistrial

At the evidentiary hearing, the State told the trial court that James, one of the youth group members, had been "convicted after this report, after 2013, for sexually assaulting his sister as a juvenile" and argued that the conviction was irrelevant to the allegations against Huddlestun. Huddlestun argued that evidence that one of the witnesses to the alleged assault against David was a "confessed sex offender" would be relevant to the officer's investigation and proposed limiting any questions related to James' conviction to the role it played in law enforcement's investigation of David's accusations against Huddlestun. The trial court sustained the State's objection, finding that "the prejudicial effect [of James' prior bad act] would outweigh the probative value."

Huddlestun then argued an alternate theory of admissibility, namely, that, because Smith testified that David had insinuated that other people might have been involved in the sexual assault, the evidence of James' sex-offender status was relevant. The trial court responded, "Well, that's what worries me, there's no evidence of anything in this case." When Huddlestun responded, "Well, now there is. It's right here," the trial court responded, "Well, not really. Just 'others,' so I'm going to sustain the objection." At that point, the State remarked:

> Your Honor, again, there's a motion in limine that was granted by the Court or agreed to by the defense about bringing in or mentioning evidence like this. They

6

mentioned [James] in the opening statement, and then they asked Sergeant Barker about [James] which is in violation of the motion in limine.

Now, before the break, [Huddlestun] wanted to ask about [James] . . . being a registered sex offender and the State bringing forth documentation to that effect, and we've researched it, and [James] -- his situation as a juvenile was deferred, so he never had to register. So, that's a misstatement of fact. Plus, it violates the motion in limine. Plus, it argues facts that were not in evidence. So the State moves for a mistrial.

The prejudicial effect has already been conveyed to the jury and they can't possibly disregard it, and so, the prejudicial effect of raising that information at this point -- is too prejudicial to the State and we're not going to be able to overcome it and we request a mistrial on that basis.

Huddlestun responded that a mistrial would be "an extraordinary remedy" and that the proper remedy would be an instruction to the jury to disregard any improper question. A brief argument followed concerning whether James was required to register as a sex offender,[4] and the trial court denied the State's request for a mistrial.[5] When trial resumed, the trial court instructed the jury, "[D]isregard the answer and the question . . . at this time. Don't consider it for any purpose at this time."

### 5. Huddlestun's Third Violation of the Trial Court's Previous Limine Orders and the State's Second Motion for a Mistrial

Later that day, Huddlestun asked Bonham Police Lieutenant Terry Bee, "Okay. If one of these witnesses had been in trouble before, that's something you would take into account. Right?"

---

[4]The State told the trial court that James was not required to register as a sex offender and purported to produce a document "deferring any registration on behalf of" James. The State asked that the document be part of a sealed record, but it was never admitted. In certain circumstances, a juvenile adjudicated guilty of a sexual offense may be exempt from the obligations of registering as a sex offender. *See* TEX. CODE CRIM. PROC. ANN. art. 62.352 (West. Supp. 2016).

[5]Although the trial court stated that it was "overrul[ing] the motion for a *new trial*," it is clear from the record that the trial court overruled the State's motion for a *mistrial*. (Emphasis added.)

Bee answered, "No, sir," and Huddlestun's counsel continued, "Especially if it was a sexual offense. Correct?" The State objected, and the trial court stated, "You know, I think it was understood a while ago when I sustained the objection that there was an order in place." Huddlestun stated that he did not plan to inquire further, but was "just talking about general investigative techniques" and would not ask about any specific instances of conduct or use any witness' name. The State again moved for a mistrial on the basis that Huddlestun had once again violated the trial court's limine rulings. The court responded, "Don't go there," and asked Huddlestun if he wanted a mistrial. Huddlestun said he did not, and the trial court denied the State's motion for a mistrial. The State then asked for an instruction to disregard, and the trial court overruled the State's objection and denied its request for an instruction to disregard the question.

### 6. Huddlestun's Interjection of Polygraph-Examination Information

The next day of trial, the State called Department of Public Safety Texas Ranger Tod Reed as a witness. Reed was stationed in Ozona, Texas, where Huddlestun was living at the time of the investigation. Reed testified that, after talking to Lieutenant Bee about the investigation, he contacted Huddlestun and asked him to give a statement. Huddlestun voluntarily met with Reed, and Reed conducted an hour-long, audio/video-recorded interview with Huddlestun. The next day, Reed obtained a warrant for Huddlestun's arrest. During cross-examination of Reed, Huddlestun's counsel pursued the following line of questioning:

> Q. [By Huddlestun's Counsel] There's nothing that you discovered after you interviewed Lyle [Huddlestun] that would refute what he told you. Right?
>
> A. [By Reed] As far as my training and experience --

Q.      What evidence --

A.      -- in interviewing people that are being deceptive, yes, he was being deceptive.

Q.      He was being deceptive.  Are you like a lie-detector machine or something?

A.      No, sir, but I've been a Texas peace officer for over 18 years.

Reed then stated that he had "extensive" training in interviewing people.  The questioning continued:

Q.      So, you're like a human lie-detector test.  Is that it?

A.      No, sir.

Q.      The way -- well, what human lie-detector test training have you had?

A.      I'm not a polygraph operator.

Q.      Okay.  But you've certainly done those before.  Right?

A.      No, I have not done a polygraph.

Q.      No, not you.

A.      A polygraph is not admissible in court, either.

Q.      Yeah, I understand that.  You haven't done a polygraph, but you've requested certain witnesses to do a polygraph, right?

[By the State]:  Again, it's not admissible in court, so, therefore, it's irrelevant, Your Honor.

[By Huddlestun's Counsel]:  Part of the investigation, Judge.
THE COURT:  Overrule the objection.

Q.      [By Huddlestun's Counsel] You -- you've asked witnesses, suspects to take a polygraph.  Right?

9

A.      Yes.  It's -- it's a tool that is used in investigation.

Q.      Did you ask [Huddlestun] to take one?

A.      No.

Q.      Okay.  Why not?  When do you -- when do you offer it to citizens that are accused and when do you not?  Who qualifies and who doesn't qualify?  What's the criteria?

A.      I was not the primary investigator

Q.      Okay.  You're a Texas Ranger.  If you want someone to take a polygraph, they're taking a polygraph.  Right?

A.      Right.

On redirect examination, the State asked Reed to explain why he did not request a polygraph examination from Huddlestun.  Reed said that, if he were "the primary investigator assisting the law-enforcement agency in [his] area, then [he] would have decide[d] whether or not to, you know, use a polygraph or not."  Because polygraph results are inadmissible in court, Reed said he seldom used such tests.

On recross examination, Huddlestun's counsel asked Reed the basis for his opinion that Huddlestun had been deceptive in their interview.  Reed said he found suspicious Huddlestun's answer to whether he had ever touched David inappropriately, and Huddlestun said, "No, sir, not intentionally if I did, but I did not."  When Reed asked Huddlestun, "Well, did it happen," Huddlestun answered, "Not that I can think of."  Reed then testified that he was suspicious when he told Huddlestun, "Now's the time to tell the truth of what happened," and Huddlestun responded, "I cannot tell you anything beyond what I told you.  There's a story somewhere that's

10

being missed." When asked to explain why he thought this was suspicious, Reed answered, "As far as, 'I cannot tell you anything beyond what I told you,' he wanted to tell the truth, but he was not telling the truth."

Huddlestun's counsel asked what else Reed was suspicious of, and Reed identified Huddlestun's statement, "I thought we had a good relationship. . . . A friendship. Why would they say something like that? Maybe -- maybe he went to college and experimented." Reed added, "That's suspicious. I mean, why would someone say, if they, you know, weren't guilty of a crime, why would they say that statement?" Reed also pointed to Huddleston's statement that he was "never alone with [David] . . . to ask the other boys, they will tell you nothing happened and, if they do, I don't know what happened." Huddlestun's counsel then asked Reed,

> Okay. Now, in cases just like this, sexual-assault cases where there is no physical evidence, where there is a delayed outcry, where there are other witnesses there who say they never saw, heard, or sensed anything, those are the kind of cases more often than not that you employ a polygraph. Right?

The State objected, stating, "The polygraph, that stuff is inadmissible." The court denied the State's request for an instruction to disregard, telling the State, "I'm not going to do that because you brought it up."[6] However, immediately thereafter, the court did tell the jury to "disregard the answer to the last question," whereupon Huddlestun pointed out that Reed did not, in fact, answer the question. At that point, the State asked for a bench conference where it moved

---

[6]It is clear that Huddlestun's counsel first mentioned polygraph examinations during his cross-examination of Reed, and therefore, the State did not first "bring up" that specific subject. However, the record reflects that, during its direct examination, the State did ask Reed for his opinion on the truthfulness of specific statements Huddlestun made during his recorded statement. As will be shown below, the specific testimony regarding polygraph examinations grew from the general discussion of Huddlestun's truthfulness in his recorded statement. Therefore, from that perspective, the trial court correctly stated that the State "brought it up" because the State first raised the general subject from which the polygraph examination testimony arose.

11

a third time for a mistrial.  The trial court responded, "I'm going to grant it to you and let Blake-- Judge Blake deal with y'all.  Okay."[7]  The trial court removed the jury and entertained arguments from counsel.

### 7.    The Trial Court Granted the State's Third Motion for a Mistrial

During the course of lengthy arguments and some confusion about whether the State opened the door to the subject of polygraph examinations or merely responded to the defense's questions when the trial court overruled the State's objections,[8] the trial court ultimately concluded,

> THE COURT:  I'll grant the mistrial.
>
> [By the State]:  Thank you, Your Honor. . . . And just so we -- can we get a finding, Judge, that the granting of the mistrial is at the State's motion because of the demonstration of manifest necessity?
>
> [By Huddlestun's Counsel]:  No.
>
> THE COURT:  Well, I'm going to grant the mistrial based upon inadmissible evidence being admitted.

Huddlestun objected to the trial court's ruling and requested that it reconsider granting the mistrial, but the court declined to do so and discharged the jury.

---

[7]Although the trial court said it was granting the mistrial at the bench conference, the record makes clear that it did not grant the mistrial at that time.  Instead, it excused the jury and heard arguments from counsel on the State's motion for mistrial.  The record of this hearing covers twenty-one pages of the reporter's record.  The trial court did not make its final decision on whether to grant the mistrial until after the hearing was completed.

Judge Laurine Blake, the elected judge of the 336th Judicial District Court, presided over most of the pretrial hearings including the one held the day before jury selection.  However, retired Judge Scott McDowell presided at trial.  The record does not indicate why Judge McDowell rather than Judge Blake heard this case.

[8]*See supra* note 6.

The trial court followed up its ruling with its findings of fact and conclusions of law. After citing the procedural history of the case, the trial court concluded:

> The impact of the unfair bias against the State caused by the polygraph questions was further enhanced by defense counsel's continued disregard of the Court's order not to mention evidence of other bad acts of potential witnesses and past sexual behavior of the victim prior to a hearing. These circumstances presented a "very extraordinary and striking circumstances [sic]" which would have resulted in an unfair verdict; therefore, such mistrial is not double jeopardy, and said writ is denied, and Defendant will remain on present bond until a trial on both cases can be heard.

When the case was set for trial a third time, Huddlestun filed an application for writ of habeas corpus, claiming the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution barred retrial. The trial court denied that application, and Huddlestun has appealed that ruling.

## II.    Legal Authorities

### A.    Burden of Proof

Texas and Federal Constitutional law is clear that, "[g]enerally, a criminal defendant may not be put in jeopardy by the State twice for the same offense." *Pierson v. State*, 426 S.W.3d 763, 769 (Tex. Crim. App. 2014). Yet,

> [d]espite the general prohibition against jeopardy-based trials, there are two exceptions when a criminal defendant may be tried a second time without violating double-jeopardy principles if the prosecution ends prematurely as the result of a mistrial: (1) if the criminal defendant consents to retrial or (2) there was a manifest necessity to grant a mistrial.

*Id*. at 769–70. These exceptions exist because of "the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused . . . ." *Washington*, 434 U.S. at 505.

13

To establish a right to relief under the Double Jeopardy Clause, "a criminal defendant must first show that he or she is being tried for the same offense for which the mistrial was declared over the defendant's objection. The burden then shifts to the State to demonstrate a 'manifest necessity' (also referred to as a 'high degree' of necessity) for the mistrial." *Pierson*, 426 S.W.3d at 770. In deciding whether the State has met its burden, the reviewing court must also decide whether the trial court declared a mistrial "'without first considering the availability of less drastic alternatives and reasonably ruling them out[,]' although the basis for the mistrial need not be expressly articulated in the record." *Id.* (quoting *Ex parte Garza*, 337 S.W.3d 903, 909 (Tex. Crim. App. 2011)). If not, then the trial court abused its discretion in granting the mistrial, and retrial is barred by the Double Jeopardy Clause. *Id.*

B.     **The Double Jeopardy Clause's Prohibition Against Retrial After Mistrial Is Not Absolute; Deciding Whether to Allow Retrial Requires a Balance of Competing Interests**

In deciding whether retrial after mistrial falls within the manifest necessity exception, the courts must balance two competing interests. On the one hand, the defendant has a "valued right to have his trial completed by a particular tribunal." *Washington*, 434 U.S. at 504 (quoting *United States v. Jorn*, 400 U.S. 470, 484 (1971)). Because of the "increase[d] . . . financial and emotional burden on the accused," the "prolong[ed] . . . period in which he is stigmatized by an unresolved accusation of wrongdoing," and the enhanced "risk that an innocent defendant may be convicted[,]" "as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial." *Id.* at 503–05.

14

On the other hand, a prosecutor is entitled to that "one full and fair opportunity to present his evidence to an impartial jury." *Id*. at 505. As the Supreme Court noted, "Unless unscrupulous defense counsel are to be allowed an unfair advantage, the trial judge must have the power to declare a mistrial in appropriate cases."[9] *Id*. at 513. Therefore, a defendant's "valued right to have the trial concluded by a particular tribunal is [and must be] sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury." *Id*. at 505; *see also Ledesma v. State*, 993 S.W.2d 361, 364 (Tex. App.—Fort Worth 1999, pet. ref'd) ("A mistrial ordinarily requires the balancing of two competing interests: the defendant's right to have the trial completed, and the public's interest in fair trials designed to end in just judgments.").

## C. The Standard of Review Varies Depending Upon the Circumstances Giving Rise to the Mistrial

Moreover, the fact that mistrials can occur in a variety of circumstances not only permits retrial in some cases, it also mandates that different standards of review be used in evaluating the trial court's decision to grant the mistrial. In *Washington*, the defendant's original conviction was reversed on appeal because the State had withheld exculpatory evidence from the defense, and

---

[9]The logic behind this conclusion is simple. If the State could never retry a defendant after a mistrial, the defense could provoke a mistrial by interjecting clearly irrelevant and prejudicial information and then, once a mistrial has been declared, assert double jeopardy as a defense to retrial. In that way, a defendant could bootstrap himself into an acquittal, and the only limitation on this strategy would be the defense's tolerance to sanctions from the trial court. While a trial judge possesses sanction power to deter "unscrupulous" behavior, eliminating the availability of retrial after mistrial would transform a criminal trial from a search for truth between the state and the defendant, into a contest of wills between the trial judge and the defense. The Court of Criminal Appeals has held that "[w]e as a people have deliberately chosen to adopt laws which interfere with the truth-seeking function of the criminal trial[,]"*Leday v. State*, 983 S.W.2d 713, 725 (Tex. Crim. App. 1998) (citations omitted), but has also recognized that "[t]he basic purpose . . . is the determination of truth," *Id.* at 724 (quoting *Tehan v. United States*, 382 U.S. 406, 416 (1966)). *See Hammer v. State*, 296 S.W.3d 555, 564 (Tex. Crim. App. 2009) ("A criminal trial . . . is designed to find the truth about a specific incident . . . .").

15

during jury selection on retrial, defense counsel told the prospective jurors "that there was evidence hidden from [respondent] at the last trial." *Washington*, 434 U.S. at 499. After discussing the considerations involved in deciding a double-jeopardy issue, the Supreme Court held that "the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused." *Id.* at 508 (footnote omitted). The Supreme Court also held that, "[a]t the other extreme is the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict, long considered the classic basis for a proper mistrial" and that "the trial judge's decision to declare a mistrial when he considers the jury deadlocked is therefore accorded great deference by a reviewing court." *Id.* at 509–10. Finally, the Supreme Court concluded, "We are persuaded that, along the spectrum of trial problems which may warrant a mistrial and which vary in their amenability to appellate scrutiny, the difficulty which led to the mistrial in this case also falls in an area where the trial judge's determination is entitled to special respect." *Id.* at 510.

The Court of Criminal Appeals has identified three instances in which manifest necessity exists for mistrial:

> [W]hen the particular circumstances giving rise to the declaration render it impossible to arrive at a fair verdict before the initial tribunal, when it is simply impossible to continue with trial, or when any verdict that the original tribunal might return would automatically be subject to reversal on appeal because of trial error.

*Ex parte Garza*, 337 S.W.3d 903, 909 (Tex. Crim. App. 2011). In *Garza*, the defendant was being prosecuted for a misdemeanor offense, and after trial began, one of the jurors became unavailable

16

due to illness. Rather than continue with a five-person jury or delay the trial to see if the sick juror would recover quickly enough to continue the trial in a timely fashion, the trial court granted a mistrial citing manifest necessity. *Id.* at 907. In explaining its ruling, the trial court said that "it is this Court's experience that when the trial takes considerably longer than what the Court had anticipated, that could create problems with the jury's attitude and the jury's willingness to process information and so forth, in my experience as a judge and as a lawyer for 20 years." *Id.* The Court of Criminal Appeals affirmed the court of appeals' decision barring retrial under the Double Jeopardy Clause, noting, "So long as the appellant may waive his constitutional right to a six-member jury, it cannot be said that it was impossible to arrive at a fair verdict, impossible as a practical matter to continue with the trial, or that reversal on appeal would automatically ensue." *Id.* at 911.

By contrast, in *Pierson*, the Court of Criminal Appeals applied "great deference" to the trial judge's decision to grant a mistrial after defense counsel questioned the complaining witness whether she had "also [made] an allegation that [Appellant] did these same things to his own daughter?" *Pierson*, 426 S.W.3d at 766. The Court of Criminal Appeals noted that, in *Washington*,

> the Supreme Court's discussion of when great deference should be accorded to the ruling of a court granting a mistrial turned on the trial judge's unique ability to evaluate whether the complained of action biased the jury and, if so, to determine if that bias can be remedied by an instruction to disregard.

*Pierson*, 426 S.W.3d at 773 (citing *Washington*, 434 U.S. at 512–13). Accordingly, the Court of Criminal Appeals rejected appellant's argument that different scrutiny should apply depending upon whether the basis for mistrial occurred in opening statement or during cross-examination, concluding, "[I]t does not appear that the Supreme Court considered when the improper comments

17

came to be as important as when a trial judge uses his or her unique ability to evaluate any potential bias created by an improper comment." *Id.* at 774.

Although the Court of Criminal Appeals did not identify the level of scrutiny it applied to the trial court's decision in *Garza*, it is clear that it gave virtually no deference to the lower court's decision. This is because, unlike the trial court's decision in *Pierson*, the trial court's decision in *Garza* did not require use of the court's "unique ability to evaluate any potential bias created by an improper comment," *Id.*, but instead was based on its belief that delaying completion of the trial "could create problems with the jury's attitude and the jury's willingness to process information and so forth," *Garza*, 337 S.W.3d at 907. Essentially, the trial court in *Pierson* was concerned whether defense counsel's improper question would unduly bias the jury against the prosecution, whereas the trial court in *Garza* was concerned whether the delayed proceedings would create problems with the jury's willingness to perform its duty. Consequently, when a trial court's decision to declare a mistrial is based on the trial court's "unique ability to evaluate any potential bias created by an improper comment," the reviewing court should afford the trial court's decision to grant the mistrial "great deference." *Pierson*, 426 S.W.3d at 774.

## III.  Application of the Great Deference Standard of Review to the Case

### A.  Introduction

The trial court's stated basis for granting the mistrial in this case was "[t]he impact of the unfair bias against the State caused by the polygraph questions," "further enhanced by defense counsel's continued disregard of the Court's order not to mention evidence of other bad acts of

18

potential witnesses and past sexual behavior of the victim prior to a hearing."[10]  Accordingly, we must evaluate three issues.  First, we must determine whether (1) Huddlestun's unsupported arguments and questions alleging that James was a registered sex offender and was present when the alleged assault occurred and (2) Huddlestun's questions of Trooper Reed regarding polygraph examinations were admissible.[11]  If not, then, we must next determine whether the trial court correctly determined that the potential for bias by the jury in hearing that evidence was of such magnitude that it was manifestly necessary to grant a mistrial.  Finally, if we find manifest necessity existed, we must then determine whether the trial court considered less drastic alternatives to mistrial.

The first issue is a question concerning the admissibility of evidence, which we review under the abuse of discretion standard.  *Sauceda v. State*, 129 S.W.3d 116, 120 (Tex. Crim. App. 2004); *Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990).  The second and third issues called upon the trial court to use its "unique ability to evaluate any potential bias created by [the evidence;]" thus, according to *Washington* and *Pierson*, we must afford the trial judge's resolution of those issues "great deference." *Pierson*, 426 S.W.3d at 774.

---

[10]At trial, the State asserted that evidence of James' sex-offender status was inadmissible under Rule 412 and that Huddlestun's mention of that alleged status before a hearing violated that Rule. As will be discussed below, Huddlestun's theory of admissibility of that evidence was that James was an alternative perpetrator.  As such, any evidence of alleged prior nonconsensual sexual activity by James toward David would have been nonconsensual.  We have previously ruled that Rule 412 does not apply to nonconsensual sexual behavior. *Woodall v. State*, 376 S.W.3d 122, 131–32 (Tex. App.—Texarkana 2012, no pet.).  Accordingly, we only address the issue concerning whether evidence of James' prior juvenile history was admissible under Huddlestun's alternative perpetrator theory of admissibility.

[11]Obviously, if the evidence and questions at issue here were admissible, then a mistrial based on their introduction before the jury could not have been manifestly necessary.  As proponent of the evidence, Huddlestun bears the burden of establishing the admissibility of the evidence. *Pierson v. State*, 398 S.W.3d 406, 415 (Tex. App.—Texarkana 2013), *aff'd*, *Pierson*, 426 S.W.3d at 775.

19

**B.**      **Were Huddlestun's Unsupported Allegations that James Was a Registered Sex Offender and that he Was Present During the Alleged Assault Admissible?**

After Huddlestun's counsel violated the trial court's second limine order and interjected the unsupported allegations that James was in the room at the time David was allegedly assaulted by Huddleston and that James was a registered sex offender, the trial court heard arguments outside the jury's presence. The transcript of that hearing covers thirty pages of the reporter's record. The trial court asked Huddlestun to identify the basis of the information's admissibility, and the following discussion took place:

> THE COURT: What -- what benefit -- what relevance one way or the other is the fact that somebody's in there besides the defendant that's a sex offender?
>
> [DEFENSE COUNSEL]: Because this is an allegation of sexual assault, and we --
>
> THE COURT: I know. What -- what relevance does that have to the issue? Are you saying he did it?
>
> [DEFENSE COUNSEL]: I think there's a good chance he did. I do. I certainly do. And we've always felt that way.
>
> [STATE'S COUNSEL]: Based on what?
>
> [DEFENSE COUNSEL]: It's cross-examination, Your Honor. I think this would be analogous, for example -- let's say we all worked for the same company, and during the time we all worked for the same company, we get accused of stealing. It turns out that sometime after we left the company, there was somebody that worked with us that actually got convicted of theft. We would want that person investigated to see if they -- if that was the person that did it.
> Do you understand what I'm saying? Say we all work together and we're accused of stealing something, and sometimes after we all work together, it turns out that one of those individuals was actually the one that was the thief, we would want that investigated. And all we're asking for is permission -- it's cross-examination. They can do redirect. They can put witnesses up and challenge it. We just want to know if -- the officers certainly know it, the Rangers certainly know it, that there was a convicted sex offender in that room at the time of some of these

20

alleged offenses. We want to know if that individual has been found and investigated. That's all we're asking to do.

Therefore, Huddlestun sought to introduce the unsupported allegations that James was a registered sex offender and that he was present when the alleged assault occurred in order to establish that James was an alternative perpetrator to Huddleston. There are several problems with Huddlestun's alternative perpetrator theory in this case.

First, even assuming that the evidence would show that James was in fact a registered sex offender as alleged by Huddlestun,[12] or that he was actually present when the alleged assault occurred,[13] the alternative perpetrator defense typically arises in "who done it" cases where the complaining witness does not know his attacker. Here, David knew Huddlestun, was a member of Huddlestun's youth group, and alleged that Huddlestun assaulted him. David did not allege that he was assaulted by a stranger, that he was assaulted by James, or that he was unsure who assaulted him; rather, he alleged that he was assaulted by Huddlestun, the man who was his youth minister at the time of the alleged assault.[14] Consequently, the "alternative perpetrator" defense is not applicable in this case under the facts in the record.

---

[12]As noted previously, the State represented to the trial court that James was charged as a juvenile and that the adjudication against him was deferred so that he never was required to register as a sex offender under Chapter 62 of the Code of Criminal Procedure. The record of that proceeding was sealed and not made a part of the record in this case.

[13]As noted, Smith testified that David insinuated that others were involved in the alleged assault, but no evidence was introduced establishing the truth of that fact or that James was one of those other persons.

[14]In Huddlestun's hypothetical to the trial court, the victim employer does not know which of his employees committed the theft. If the hypothetical were modified to mirror the facts in the present case, one of the co-workers would be alleging to the owner that a fellow co-worker took his money from him by force. In the modified hypothetical, the question would not be which of the co-workers committed theft against the owner, but whether the co-worker identified by the victim did, in fact, commit the theft against the complaining co-worker as alleged.

But even if the defense were applicable, Huddlestun failed to demonstrate a foundation sufficient to support the defense. The Court of Criminal Appeals has held that

> [a]lthough a defendant has a right to attempt to establish his innocence by showing that someone else committed the crime, he still must show that his proffered evidence regarding the alleged alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the alleged "alternative perpetrator."

*Wiley v. State*, 74 S.W.3d 399, 406 (Tex. Crim. App. 2002). Furthermore, "[i]t is not sufficient for a defendant merely to offer up unsupported speculation that another person may have done the crime. Such speculative blaming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice." *Martinez v. State*, 212 S.W.3d 411, 424 (Tex. App.—Austin 2006, pet. ref'd) (quoting *Michaelwicz v. State*, 186 S.W.3d 601, 647 (Tex. App.—Austin 2006, pet. ref'd) (quoting *United States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998))).

Thus, in *Martinez*, for example, the defendant was charged with sexually assaulting his wife's eight-year-old cousin. *Id.* at 414. The child told her mother about the alleged assault, and her mother contacted the police. *Id.* The court of appeals noted that, "[i]n addition to denying the allegations, Martinez's trial strategy apparently included suggesting that the complainant's brother may have been the actual perpetrator." *Id.* at 416. The trial court sustained the State's objection to this evidence, and Martinez appealed. *Id.* The trial court found that there was no evidence that the child's brother had ever assaulted her. The court of appeals ruled, "We conclude that excluding this evidence did not violate Martinez's right to present a complete defense. The proffered evidence fails to establish a connection between [the child's] brother and the abuse [the child

alleged].  Any suggestion that [the child's] brother was an alternative perpetrator is both 'meager and speculative.'"  *Id.* at 424 (citing *Wiley*, 74 S.W.3d at 406).

Moreover, Huddlestun failed to present any testimony or evidence or make any offer of proof establishing that he had evidence to establish that James had ever assaulted David.[15]  Therefore, there is no evidence "on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the alleged 'alternative perpetrator.'"  *Wiley*, 74 S.W.3d at 406.  Therefore, "[a]ny suggestion that [James] was an alternative perpetrator is both 'meager and speculative,'" and evidence about his juvenile history was therefore inadmissible.  *Martinez*, 212 S.W.3d at 424 (citing *State*, 74 S.W.3d at 406).

**C.**      **Was Evidence of Ranger Reed's Failure to Obtain a Polygraph Examination From Huddlestun Admissible?**

As mentioned, Huddlestun's counsel cross-examined Ranger Reed about when and how polygraph examinations are used to rule out suspects in criminal investigations.  The Court of Criminal Appeals has made it clear that the results of polygraph examinations are inadmissible "*for all purposes.*"  *Nethery v. State*, 692 S.W.2d 686, 700 (Tex. Crim. App. 1985).  Moreover, "[e]ven if the State and the defendant agree and stipulate to use the results of a polygraph at trial, [the Court of Criminal Appeals has] held the testimony to be inadmissible."  *Id.* (citing *Crawford v. State*, 617 S.W.2d 925 (Tex. Crim. App. 1981)).  Yet, trial courts sometimes err in admitting inadmissible evidence, and sometimes inadmissible evidence is erroneously presented to the jury

---

[15]*See supra* note 12.  It is true that the alternative perpetrator information was introduced early into the State's case and that Huddlestun had not yet put on any evidence.  Nevertheless, the trial court held a lengthy hearing outside the jury's presence and allowed Huddlestun to make an offer of proof to support the information.  Huddlestun failed to present any evidence in his offer of proof which would support application of the alternative perpetrator defense.

despite the trial court's rulings. In such cases, the question becomes whether the error was harmful.[16] Accordingly, notwithstanding the across-the-board prohibition on the admission of polygraph examination results, we must consider whether Huddlestun's reference to polygraph examinations in general could have been harmless and, therefore, incapable of supporting a finding of manifest necessity for purposes of granting a mistrial.

No bright line exists as to when the erroneous introduction of polygraph examination results constitutes reversible error or manifest necessity for a mistrial and when it does not.[17] Most cases examining the issue turn on whether admission of that evidence would cause the jury to speculate about the test results or unduly bolster a witness' testimony. For example, in *Wright v. State*, "[t]he State told the jury in its opening statement that the investigator in this case offered Wright the opportunity to take a polygraph examination," but then told the jury that the results of the test would not be admitted. *Wright v. State*, 154 S.W.3d 235, 238 (Tex. App.—Texarkana 2005, pet. ref'd). We found the introduction of the evidence to be error. *Id*. at 239. We then found the error was harmful,

> We cannot say, with confidence, that the State's discussion of the polygraph examination, and having two witnesses testify about that examination, did not influence the jury or had but a slight effect. Much has been made of the inherent unreliability of polygraph examinations, and hence their inadmissibility in criminal trials in Texas. Despite the cautions of both the trial court and the attorney for the State, we find that broadcasting to the jury that Wright was given a polygraph examination presented too great a danger that the jury speculated on the

---

[16]For example, "[n]umerous cases have held that where a witness gives a nonresponsive answer that mentions that a polygraph test was *offered* or *taken*, but does not mention the results of such test, there is no error in failing to grant a mistrial." *Kugler v. State*, 902 S.W.2d 594, 595 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd).

[17]As is explained below, the present case involves a reference to polygraph examinations in general when no polygraph was performed. Thus, cases concerning the admission of polygraph examination results are not on point with the present case. Nevertheless, the reasoning in these cases is helpful in deciding the issue presented here.

examination's outcome. Such speculation is especially likely in a case like this where there is no scientific evidence substantiating the conviction and where the validity of that conviction is largely dependent on the credibility of the witnesses.

*Id*. at 240.

Likewise, in *Nichols v. State*, the State asked the complaining witness, "Without telling me any results, did you take a lie detector test about this?" *Nichols v. State*, 378 S.W.2d 335, 336 (Tex. Crim. App. 1964). The witness answered yes over the defendant's objection, and the trial court sustained the defendant's objection, instructed the jury to disregard the question and answer, and denied a mistrial. *Id*. On appeal, the Court of Criminal Appeals held,

> [W]e think that the learned trial judge fell into error in not granting appellant's motion for mistrial. We think it fair to observe that the only reason that anyone would possibly take a lie detector test would be to determine whether or not they were telling the truth. . . . This, we think[,] was highly prejudicial to the rights of appellant, and the harm done was so great that no instruction from the court could remove it. This testimony in effect revealed the results of the lie detector test[,] and this was inadmissible.

*Id*. at 337. The Court of Criminal Appeals further explained,

> An impression must have been implanted in the minds of the jurors that the result of the lie detector test had been unfavorable to appellant or else appellant's counsel would not have objected to the question propounded by the state. The jurors, being lay persons, no doubt felt that the evidence of a lie detector test would reveal the truth and that appellant was attempting to suppress the truth from them by objecting to the question and keeping the testimony from them.

*Id*. The Court of Criminal Appeals concluded,

> In a situation where the state's whole case depended entirely upon the testimony of this one 14 year old witness whose credibility must have appeared somewhat

25

shaken to the Assistant District Attorney and must have, he thought, be[en] in need of bolstering, the appellant should not have been placed in this intolerable position.

*Id*. at 338.[18]

Of course, in *Wright* and *Nichols*, the defendant or witness took a polygraph examination, results were obtained, and the issue turned on the admissibility of either the test results or the fact that the test was taken. Here, by contrast, Huddlestun's questions focused on the fact that *no* polygraph examination was performed. Also, in most cases, the issue is whether the State's interjection of polygraph information unduly prejudices the jury against the defendant, whereas here, the issue is whether the defendant's interjection of polygraph information prejudiced the jury against the State. Accordingly, this case presents the question whether the nonperformance of a polygraph examination by the defense unduly prejudiced the State to such an extent that granting a mistrial became a manifest necessity.

This Court has not been able to find any cases directly on point. Two courts have considered whether the nonperformance of a polygraph examinations is admissible. In *Kugler*, the State's witness "gave nonresponsive answers to the prosecutor's questions that revealed that appellant was offered, but refused to take, a polygraph examination." *Kugler*, 902 S.W.2d at 595. The Houston First Court of Appeals held that such comments were inadmissible and overly prejudicial because, "[u]nder these circumstances, appellant's refusal to take a polygraph test could lead the jury to improperly infer that he had something to hide." *Id*. at 597. And in *Bradley v.*

---

[18]*See also Stewart v. State*, 705 S.W.2d 232, 234 (Tex. App.—Texarkana 1986, pet. ref'd) ("It logically follows that it is improper to allow evidence even implying that [a polygraph] test was taken if the effect of such evidence is to implicitly impeach the defendant's testimony or defensive theory, or to bolster the State's case.").

*State*, the appellant sought to introduce the fact that the State's key witness, who had changed his statement to favor the State after flunking the first polygraph examination, was never asked to undergo a second polygraph examination after changing his story. *Bradley v. State*, 48 S.W.3d 437, 443 (Tex. App.—Waco 2001, pet. ref'd). The Waco Court of Appeals affirmed the trial court's refusal to admit the evidence, holding that "[t]he Court of Criminal Appeals has held that a court commits error by admitting testimony regarding a polygraph examination which 'lend[s a witness's] testimony more credibility.'" *Id*. (quoting *Tennard v. State*, 802 S.W.2d 678, 684 (Tex. Crim. App. 1990) (per curiam)).

However, regardless of whether the case involves an actual polygraph test or the nonperformance of a polygraph test, the potential harm is the same: namely, the jury will speculate about the results (or non-results) or a witness (or a defendant's) testimony (or position) will be bolstered. Accordingly, we see no reason to create a separate standard depending upon whether the aggrieved party is the defendant or the State. Considering the competing issues that must be balanced in resolving a double-jeopardy claim, it seems clear that the same standard should be applied regardless of which party is aggrieved. Consequently, regardless of whether the case involves an actual polygraph test or the nonperformance of a polygraph test, the reviewing court looks to whether the information could cause the jury to speculate about the results (or non-results) or improperly bolsters a witness's (or defendant's) testimony (or position) in deciding whether the erroneous admission was harmful.

In the present case, Huddlestun's questions suggest that, if Reed had offered him a polygraph examination, he would have taken and passed that examination, that the State's officers

knew he would pass it, and that, therefore, they did not ask him to take one. Not only do these questions invite the jury to speculate about the results of a non-performed polygraph examination, they also put the State in the position of the defense in *Nichols*, where "[t]he jurors, being lay person, no doubt felt that the evidence of a lie detector test would reveal the truth and that [the State] was attempting to suppress the truth from them by objecting to the question and keeping the testimony from them." *Nichols*, 378 S.W.2d at 337. This is precisely the kind of improper bolstering and invitation to speculate that the Court of Criminal Appeals condemned in *Nichols* and that we condemned in *Wright*. Therefore, evidence regarding Ranger Reed's failure to request a polygraph examination from Huddlestun was inadmissible.

**D.     Was the Introduction of Huddlestun's Unsupported Allegations about James, as Well as his Reference to Ranger Reed's Failure to Obtain a Polygraph Examination from Huddlestun, so Prejudicial that it Became Impossible to Arrive at a Fair Verdict Before the Initial Tribunal?**

As noted earlier, if the evidence in question was admissible, or if its admission was harmless, then no manifest necessity for a mistrial could have existed. On the other hand, the fact that the evidence was inadmissible or harmful does not establish that manifest necessity existed, either. Rather, we must decide whether the introduction of the inadmissible evidence was so prejudicial that it became impossible to arrive at a fair verdict before the initial tribunal.

Yet, we do not substitute our opinion for the trial judge's opinion. *Ledesma*, 993 S.W.2d at 365 ("[I]f the record shows that the trial judge exercised sound discretion in finding a manifest necessity for a retrial, the judge's sua sponte declaration of a mistrial is not incorrect just because the reviewing court might have ruled differently."); *Pierson*, 398 S.W.3d at 419 ("While we may not have reached the same decision, we cannot say that the trial court acted irresponsibly or

irrationally."). Instead, we give "great deference" to the trial court's decision. *Washington*, 434 U.S. at 510. Accordingly, unless "the trial judge act[ed] for reasons completely unrelated to the trial problem which purports to be the basis for the mistrial ruling" or "if [the] trial judge act[ed] irrationally or irresponsibly," *Renico v. Lett*, 559 U.S. 766, 775 (2010) (quoting *Washington*, 434 U.S. at 514), or if the trial court "declare[d] a mistrial without first considering the availability of less drastic alternatives and reasonably ruling them out," *Garza*, 337 S.W.3d at 909, then we defer to the trial court's determination.

In *Pierson*, we found, and the Court of Criminal Appeals agreed, that "the trial court exercised sound discretion in (a) granting the parties an opportunity to argue their positions on declaration of a mistrial, (b) considering alternatives to a mistrial, and (c) using its discretion to conclude the defense lacked a legitimate basis for the question." *Pierson*, 426 S.W.3d at 775 n.14 (quoting *Pierson*, 398 S.W.2d at 418). Several of those factors are present in this case. First, not only did the trial court entertain arguments regarding the necessity of a mistrial, the trial court also gave the parties several opportunities to argue their positions on the evidentiary questions leading to the mistrial. When Huddlestun violated the pretrial ruling on the State's motion in limine, the trial court granted a second limine order, telling Huddlestun's counsel, "Don't talk about it. We'll have a hearing outside the presence of the jury, because I can't hardly hear you, and I'm not really sure how that fits in. So just don't go into it anymore." The trial court denied a limiting instruction at that time, and Huddlestun finished his opening statement.

Later, when Huddlestun's counsel violated the second limine order, the trial court excused the jury for an early lunch and listened to arguments from counsel regarding the admissibility of

29

the disputed evidence. The subsequent discussion between the trial court and counsel covers thirty pages of the reporter's record. After listening to the arguments in detail and after having sustained the State's objection and announcing its intent to instruct the jury to disregard the testimony, the trial court then entertained Huddlestun's offer of proof of that testimony. Finally, when Huddlestun violated the trial court's limine order a third time, the trial court reminded Huddlestun's counsel that it had sustained the objection and that there was an order in place prohibiting it from coming into evidence.[19]

In *Ex parte Bruce*, the Fort Worth Court of Appeals found manifest necessity for a retrial based on the defendant's violation of the trial court's ruling on a motion in limine during opening statements. *Ex parte Bruce*, 112 S.W.3d 635, 638 (Tex. App.—Fort Worth 2003, pet. denied). In that case,

> [a]ppellant was charged with aggravated sexual assault of a child and indecency with a child. The trial court had previously granted the State's motion in limine that prevented defense counsel from discussing specific instances of misconduct under Texas Rule of Evidence 608. Specifically, defense counsel was prohibited from mentioning that complainant had made previous false accusations of sexual misconduct.
>
> During opening statements before the jury, defense counsel stated, "[D.H.] then will be–should be able to remember and will tell you that this summer–and Donna [H.] and Ricky [H.], her parents, will tell you that this summer [D.H.] admitted making a false–." The State immediately objected, and the court ordered the jury out of the courtroom.

---

[19]In response to this third violation, the State asked for an instruction to disregard. Huddlestun then objected to such instruction, and the trial court said, "Well, you made an objection. I never did rule on it. That's when you approached the bench. So, I'll overrule the objection." Although the trial court did not specify which objection it was overruling, it appears from the context of the record that it overruled the State's initial objection to Huddlestun's question, particularly since the trial court did not give the requested instruction to disregard. The record does not indicate why the trial court overruled the State's objection to the third violation of the court's previous ruling that the evidence was inadmissible.

*Id.* (citation omitted). After "admonishing defense counsel," the trial court granted a mistrial on its own motion, finding that manifest necessity existed because "the statements were so outside the record and so unable of being supported by evidence in the presence of the jury that an instruction to disregard could not remove the cloud from the minds of the jury." *Id.* Prior to retrial, the defendant sought a writ of habeas corpus on the basis retrial would constitute double jeopardy. *Id.* The trial court denied the writ application, and the defendant appealed. *Id.* at 639. The Fort Worth Court of Appeals affirmed, holding,

> Here, the trial judge was faced with the choice of continuing a trial, in which defense counsel had implied that the complainant had made prior false accusations of sexual assault, or declaring a mistrial. The trial judge was in the best position to determine if the jury would be biased by the statement because he listened to the delivery of the argument and observed the apparent reaction of the jurors. . . . He had previously granted the State's motion in limine concerning the false accusation and had warned defense counsel not to discuss it because it violated Texas Rule of Evidence 608(b). The judge had warned defense counsel at least six months prior to trial that the allegation was inadmissible. The trial judge and attorneys also had another pretrial conference in which the judge again stated that it would not be admissible.

> . . . . Although appellant argues his partial statement alone did not constitute ineffective assistance of counsel, the record clearly indicates that the trial judge considered the circumstances that occurred before the statement, which included the pretrial conferences concerning the issue and the granting of the State's motion in limine. . . . Thus, the trial judge did not rely on one isolated incident to reach his conclusion and declare a mistrial.

*Id.* at 641–42 (citations omitted).

*Bruce* involved a single violation of the trial court's motion in limine after receiving several rulings and warnings. Here, Huddlestun violated the trial court's pretrial and trial limine orders on three separate occasions after several warnings and then ventured into a fourth examination regarding a topic that was inadmissible "*for all purposes.*" *Nethery*, 692 S.W.2d at 700 (citing

31

*Crawford*, 617 S.W.2d at 925). Accordingly, in deciding whether the trial court abused its discretion in finding manifest necessity to grant the mistrial, we review not just the prejudicial effect of each violation in isolation, but the cumulative prejudicial effect of all of them.

Initially, the trial court took a measured approach to Huddlestun's actions by granting orders in limine rather than simply excluding the evidence. This measured approach was appropriate because, at that time, evidence of James's presence was potentially admissible.[20] Yet, instead of complying with the trial court's wait-and-see approach, Huddlestun continued to interject information that violated the orders in limine. Then, when the hearing to consider the admissibility of that evidence was finally held, Huddlestun failed to establish any valid theory of admissibility or to make any offer of proof establishing a foundation for its admissibility. At that point, not only did it become clear that the evidence was not admissible, but in view of the subsequent reference to polygraph examination results, the prejudicial effect of that evidence became manifest. Although it could be argued that each of the violations, by themselves, may not have been sufficiently prejudicial to justify a mistrial, we cannot say the trial court abused its discretion in finding that manifest necessity for a mistrial existed in view of the cumulative effect on the jury of all of the improperly referenced information.

**E.     Did the Trial Court Consider Less Drastic Alternatives to Granting a Mistrial?**

As previously noted, we must also consider whether the trial court granted the mistrial "without first considering . . . less drastic alternatives and reasonably ruling them out." *Pierson*,

---

[20]*See infra* note 22.

426 S.W.3d at 770 (quoting *Garza*, 337 S.W.3d at 909).  If it did, then we must find that the trial

court abused its discretion.  *Id*.  In *Bruce*, the court of appeals noted that the trial court

> further found that defense counsel's statements were so outside the record and
> clearly calculated to inflame the minds of the jury "that an instruction to disregard
> could not remove the cloud from the minds of the jury."  Thus, the trial court
> determined whether alternative courses of action were available and then ruled a
> mistrial was a manifest necessity.  Based on this record, we cannot say that the trial
> judge abused his discretion by declaring a mistrial.

*Bruce*, 112 S.W.3d at 641 (citation omitted).

In the present case, the trial court did not articulate a consideration of less drastic

alternatives to mistrial on the record before declaring the trial over.  Yet, the record reflects that,

not only did the trial court consider less drastic alternatives, it *attempted* less drastic alternatives

to mistrial on several occasions.[21]  The record further reflects that, not only did these efforts fail to

curb further violations of the trial court's limine orders, Huddlestun followed them up with a cross-

---

[21]The record reflects at least five instances when the trial court used less drastic measures than mistrial.  First, when Huddlestun's counsel violated the pretrial limine order by referencing the "presence of a registered sex offender," the trial court granted a trial limine order directing counsel not to mention the information again until after a hearing could be held outside the jury's presence.  The trial court then denied the State's request for an instruction to disregard the information.  Second, when Huddlestun's counsel violated the trial limine order, the trial court excused the jury and held a hearing to determine the admissibility of the information that covers almost thirty pages of the reporter's record.  When Huddlestun's counsel was unable to establish a valid basis for admitting such evidence, the trial court sustained the State's objection and instructed the jury to disregard the information.  Third, when Huddlestun's counsel again referenced James' presence, the trial court sustained the State's objection and admonished Huddlestun's counsel to follow the trial court's ruling.  Fourth, after the State sought to ameliorate Huddlestun's cross-examination about polygraph evidence by establishing on redirect that such evidence was inadmissible in court, Huddlestun asked Reed on recross examination to admit that the present case was one in which he would typically perform a polygraph examination.  The trial court sustained the State's objection and instructed the jury to disregard the question and answer.  Fifth, the trial court indicated its intent to grant the State's third motion for mistrial, excused the jury, and held a hearing outside its presence to give the parties an opportunity to address the issue.  The reporter's record from that hearing is twenty-one pages in length.  After hearing the parties' arguments at length, the trial court granted the mistrial.  Later, it issued its findings of fact and conclusions of law.  Accordingly, by the time the trial court granted the mistrial, it had already granted two limine orders, admonished counsel on the record not to reference the information, sustained the State's objections before the jury twice, instructed the jury to disregard the information twice, and held two lengthy hearings outside the jury's presence.

examination into an area that is inadmissible *"for all purposes."* *Nethery*, 692 S.W.2d at 700

(citing *Crawford*, 617 S.W.2d at 925). The Court of Criminal Appeals has held that "[t]he judge

need not expressly state his reasons in the record as long as the basis for his ruling is adequately

disclosed by the record." *Hill v. State*, 90 S.W.3d 308, 313 (Tex. Crim. App. 2002); *see also*

*Washington*, 434 U.S. at 516–17 ("Since the record provides sufficient justification for the state-

court ruling, the failure to explain that ruling more completely does not render it constitutionally

defective.").

Applying the great deference standard of review to the trial court's decision, it is

conceivable that, by the time Huddlestun interjected Reed's failure to administer a polygraph

examination, the trial court concluded that there was no basis for introduction of the alternative

perpetrator evidence and that its efforts to restrain the introduction of polygraph examination

information were just as unlikely to succeed as its prior efforts to constrain Huddlestun's

allegations that James was a registered sex offender and was present when the alleged assault

occurred.[22] When the trial court's actions are evaluated in light of the Supreme Court's analysis

of the trial court's actions in *Washington*, it is clear that the trial court here gave due consideration

to the availability of less drastic measures. *Washington*, 434 U.S. at 514–16.

---

[22]To be clear, we are not holding that evidence of this nature would never be admissible. *See Hammer*, 296 S.W.3d at 569 ("Although there is considerable prejudice in allowing [the alleged victim] to be cross-examined about her sexual conduct with her boyfriend . . . this is not 'unfair' prejudice because it serves the important function of explaining precisely why [the alleged victim] might be motivated to falsely accuse appellant. . . ."). Rather, we hold that, on the record presented in this appeal, the evidence was not admissible. Because the evidence was also highly prejudicial, the trial court did not abuse its discretion in determining that a mistrial was manifestly necessary and that no less dramatic alternative to mistrial existed.

Consequently, and notwithstanding the trial court's failure to articulate its specific reasons for granting the mistrial, we find that the record demonstrates the consideration (and utilization) of less drastic alternatives prior to granting the State's motion.

## IV.     Conclusion

Accordingly, for the foregoing reasons, we affirm the trial court's order denying Huddlestun's application for writ of habeas corpus.


Ralph K. Burgess
Justice

Date Submitted:     March 8, 2016
Date Decided:       November 4, 2016

Publish