

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-24-00158-CR

———————————————————

MACK FEAGINS, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 462nd District Court
Denton County, Texas
Trial Court No. F23-4474-462

---

Before Birdwell, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

Appellant Mack Feagins appeals his conviction for continuous sexual abuse of a young child for which he was sentenced to life in prison. In four issues, he argues that his constitutional rights were violated because he was not allowed to present a complete defense, that the evidence is insufficient to support his conviction, that the trial court abused its discretion by denying him the opportunity to discuss an alternative perpetrator, and that the trial court erred by denying his motion to suppress. Because we hold against Appellant on each of his issues, we affirm.

## II. Background

The complainant, who was nine years old at the time of the offense and thirteen years old at the time of the trial, testified that while she was home sick from school on October 30, 2020, she was left with her stepdad—Appellant[1]—and her disabled maternal uncle Joshua[2] when her mother (Mother) went to pick up her siblings from school. According to the complainant, Appellant came to her room, said that he wanted to watch a movie, and locked the door. They did not, however, watch a movie.

---

[1]The complainant referred to him as her dad even though he was not her biological father.

[2]The complainant did not mention Joshua's being at the house, stating that he lived with her grandparents but that he visited regularly and sometimes spent the night; Joshua's presence during the incident at the home came up during Mother's testimony. He was still at the home when the police arrived.

Appellant took off the complainant's pants and underwear; he then took off his clothes and lay down next to her on the couch in her bedroom. Appellant put his private part in the complainant's private part, touched her butt, and put his private part in her butt. The complainant said that it had hurt and that she had cried.

The complainant could not recall whether on this specific occasion Appellant had licked her private part, but he had done that before on more than one occasion. Also on more than one occasion Appellant had tried to make the complainant touch his private part, but she had pulled away. The complainant testified that Appellant's sticking his private part into her private part had started when she was in the second grade and had occurred more than fifteen times. The October 30, 2020 incident while she was in fourth grade was the final time.

After Appellant left the complainant's room, she texted her mother: "[M]ommy, daddy's raping me." After the complainant's mother saw the text, she called her mother and stepfather (Grandmother and Grandfather), and they went to the hospital with Mother, the complainant, and the complainant's sister.[3]

---

[3]The complainant later testified that only her sister, Mother, and Grandmother had gone to the hospital with her. On cross-examination when the complainant was specifically asked whether Grandfather and Grandmother had gone with her, she said only Grandmother.

The complainant also testified about seeing Appellant do something inappropriate with her younger sister Lydia.[4] The complainant said that she and Lydia had been eating breakfast when Appellant told Lydia to go with him to the garage, which was his man cave. They were gone for a long time, so the complainant went to "spy on them" and saw that Lydia was crying. The complainant said that Lydia's bottoms were off, that Appellant's bottoms were halfway off, that he was holding her on top of him, and that he was touching her butt. The complainant approximated that she was seven years old at that time and that Lydia was four or five years old.

On cross-examination, the defense asked whether the complainant often went to her grandparents' house after school, and she answered that she had gone every day. The complainant said that she and her sisters spent the night at their grandparents' house once a month or every two months.

Mother testified that she was married to Appellant from 2014 to 2020; that he is the father of two of her daughters—not the complainant or Lydia; and that she divorced him after the October 2020 incident. Regarding the October 2020 incident, Mother recalled receiving a text from the complainant, and Mother recounted how the complainant had not ridden with her to pick up her siblings from school because

---

[4]We use a pseudonym to protect the child's identity. *See* Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982); *cf.* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

4

the complainant was sick.  Mother said that Joshua and Appellant were at home with the complainant.  Mother rushed home when she saw the complainant's text.

Mother testified that she had taken the complainant and Lydia to the hospital and that Grandmother had met them there.[5]  Mother explained that she had taken Lydia because she said that something had also happened to her but had not given any specifics.  Mother said that the hospital had called the police and that the police had come to the hospital.  Both girls underwent sexual-assault examinations.

Lydia, who was eleven at the time of the trial, testified about the day that Appellant had asked her to go into the garage with him.  Appellant took his and Lydia's clothes off and put his private part in her private part.  Lydia said that it had hurt a lot.

The sexual-assault nurse examiner (the SANE) testified that she had performed sexual-assault exams on the complainant and on Lydia.  When the SANE asked what had brought the complainant to the hospital, she replied that her stepdad "did this today, around 3:00 today."  The complainant then provided more details, which the SANE wrote in her report:

> [Appellant] took my pants off and my panties.  He put his thing -- clarified and says his boy part -- in my part, points to between legs[, which the SANE clarified was the vaginal area].  He only had a shirt and underwear on.  He pulled down his underwear.

[5]Mother was asked why her last name differed from Grandmother's, and she said that Grandmother had later married Grandfather, who happened to share Appellant's last name.  Other testimony revealed that Grandfather was Appellant's uncle.

5

I have a little couch in my room, and it happened on there. He put his thing inside my private part. It hurt really bad, and I was crying. He kept trying to make me touch his thing, but I kept pulling away. She made a motion of how she pulled away. His hands were on my thigh and butt. His private part was long, brown, and curled at the end.

The other times were the same as far as what he did, but once was in the living room and once was in my sister's room.[6] He told me today he wanted to watch a movie. He didn't want to watch a movie at all. He locked the door and did that to me. He saw my mom out the window[,] and then he quit.

Sometimes he would try to put his tongue right there. Points to between legs.

Sometimes I would spy on him. He would go into [Lydia's] room, and I would hear her crying. But I couldn't see, just hear her cry. I started telling her what he did to me, and we decided to tell my mom.

Based on this history, the SANE had reason to believe that there was penetration of the complainant's vagina. The SANE swabbed the inside of the complainant's cheeks, vulva, and vagina.

The SANE testified that Lydia had given fewer details about what Appellant had done to her—stating only that it had occurred in the garage and in other rooms, that he had taken off her pants and underwear, that it was dark, and that she could not see what he was doing—before shutting down and refusing to talk.

Several days after the incident, both Lydia and the complainant underwent forensic interviews. The forensic interviewer testified that during the complainant's interview, she said that Appellant had sexually abused her more than one time, and

---

[6]The hospital records noted that the complainant said that this "ha[d] been going on for a long time."

she was able to articulate sensory details, such as how her body felt. The forensic interviewer said that then eight-year-old Lydia was more reserved, which made it difficult to gather details. But Lydia was able to articulate facts and circumstances that gave rise to a sexual offense involving Appellant that had occurred in the garage. The forensic interviewer said that she had no concerns that the children had been coached regarding what to say during the interview.

Detective April McDonough with the Denton Police Department watched from a one-way mirror while the forensic interviews were conducted. She said that she had reviewed the SANE's report and that the complainant's version of the events that was relayed to the SANE was consistent with what she had said during her forensic interview and with what she had told Mother.

Detective McDonough testified that she had gone to the complainant's home and had spoken to Appellant and Joshua. Joshua consented to Detective McDonough's collecting his DNA via a buccal swab of the inside of his mouth. Appellant denied the allegations.

Detective McDonough later obtained a search warrant and swabbed the inside of Appellant's cheek to obtain a sample of his DNA.

The State's DNA expert testified that male DNA had been detected on the complainant's vaginal and vulval swabs and that semen had been detected on the complainant's underwear. As to the male DNA that was detected on the complainant's vaginal and vulval swabs, the expert said that Y-STR testing revealed

7

that Appellant could not be excluded as a contributor of the male DNA profile and that any of his paternally related male relatives could not be excluded as the contributor of that male DNA. The expert explained that the known sample from Appellant had been compared to the epithelial cell fraction that was obtained from the complainant's underwear and that "[t]he probability of obtaining this mixture profile if the DNA came from the victim[; Appellant;] and one . . . unknown individual is 4.74 million times greater than the probability of obtaining this profile if the DNA [was] from the victim and two . . . unknown individuals." She further explained that this likelihood ratio indicates support for the proposition that Appellant is a possible contributor of the profile. The expert said that Joshua was excluded as a contributor of the profile found on the complainant's underwear and that he was also excluded as a contributor to the male DNA profile that was found on the complainant's vaginal and vulval swabs. On cross-examination, the defense asked the extent of the paternal lineage that would be included as possible contributors of the profile, and the expert said that the paternal lineage would include a grandfather, his sons, and any male sons the uncles or brothers had.

Detective McDonough testified that she decided to charge Appellant with continuous sexual abuse of a child when "the DNA that came back matched his DNA." She later clarified that the DNA matched Appellant's male lineage.

After hearing the above evidence, the jury found Appellant guilty of continuous sexual abuse of a young child as alleged in the indictment. The punishment trial

8

commenced, and the jury assessed Appellant's punishment at life in prison. The trial court sentenced Appellant in accordance with the jury's verdict. He then perfected this appeal.

### III. Constitutional Arguments Not Preserved

In his first issue, Appellant argues that the trial court prevented him from presenting a complete defense in violation of his Fifth and Sixth Amendment rights. Appellant implicitly acknowledges that this court could determine that his constitutional arguments "somehow [were] not sufficiently preserved." That is indeed the conclusion that we reach.

### A.    Applicable Law

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). Further, the party must have obtained an express or implicit adverse trial-court ruling or objected to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Dixon v. State*, 595 S.W.3d 216, 223 (Tex. Crim. App. 2020). While the right to present a complete defense is rooted in constitutional protections, even constitutional rights may be forfeited if the proper request, objection, or motion is not asserted in the trial court. *See Saunders v. State*, No. 03-19-00191-CR, 2021 WL 1031343, at *4 (Tex. App.—Austin Mar. 18, 2021, no pet.) (mem. op., not designated for publication).

9

## B.    What the Record Shows

During a hearing on Appellant's motion in limine, it was brought to the trial court's attention that he wanted to discuss Grandfather's prior criminal conviction during opening statement. The State noted that Grandfather's prior conviction for aggravated sexual assault of a child was almost twenty years old, and the State objected to the use of that conviction based on Rule 609 (due to the conviction's remoteness), Rule 403 (due to its prejudicial effect substantially outweighing any probative value), and Rule 404 (due to the impropriety of offering character-conformity evidence). Appellant responded that Grandfather had access to the complainant and Lydia because they went to their grandparents' house after school and that he could therefore possibly have been the perpetrator. Appellant brought up the fact that Grandfather may have gone with the children to the hospital on October 30, 2020, and might have made the children afraid to implicate him. Appellant, however, never mentioned his Fifth and Sixth Amendment rights. The trial court ruled that Appellant could ask the children about whether Grandfather was in the car with them when they went to the hospital and whether he had said anything to them.[7]

---

[7]To the extent that Appellant's argument encompasses his attempt during punishment to question Grandmother about Grandfather's prior criminal history—which he characterizes as a bill—an offer of proof must be made before the reading of the jury charge and was thus not timely. *See Gladney v. State*, No. 05-11-01088-CR, 2012 WL 5949473, at *3 (Tex. App.—Dallas Nov. 28, 2012, pet. ref'd) (mem. op., not designated for publication) (holding that appellant's offer of proof regarding limited cross-examination during guilt–innocence was not made in a timely fashion when it

After the guilt–innocence trial started, Appellant approached the bench and stated that he wanted to ask the detective if Grandfather had been a suspect. The trial court agreed to that. Appellant then asked if he could question the detective about Grandfather's being a registered sex offender and whether the detective was concerned that Grandfather had access to the complainant. As noted by the State and as borne out by the record, Appellant never articulated a legal basis for the admission of Grandfather's criminal history; Appellant merely noted that the detective had discussed who had access to the complainant. When the trial court ruled that Appellant could ask only whether the detective had considered Grandfather as a suspect, Appellant did not object to the ruling or mention his need for the evidence on the basis that he presents on appeal—to present a complete defense. When Appellant asked the detective whether she had any concerns about "anybody else in . . . [M]other's household or . . . [G]randmother's household" other than Appellant, the detective answered, "I did not." Appellant did not call Grandfather to testify.

C. **Analysis**

The record demonstrates that Appellant did not object on the ground that his constitutional right to present a complete defense was compromised by the exclusion of the evidence of Grandfather's remote conviction. Because Appellant did not articulate that his right to present a complete defense required the admission of

was made at the end of the punishment phase of trial—well after the jury charge was read for the guilt–innocence phase).

11

Grandfather's prior conviction, the trial court never had the opportunity to rule on this rationale. *See id.* The record thus reflects that Appellant failed to satisfy the preservation-of-error requirements concerning his constitutional complaint because he did not raise a violation of his right to present a complete defense in any way to the trial court. *See id.*; *see also Golliday v. State*, 560 S.W.3d 664, 670–71 (Tex. Crim. App. 2018) (explaining that to preserve argument that exclusion of defensive evidence violates constitutional principles, defendant must state the grounds for the ruling sought with sufficient specificity to make the trial court aware of the constitutional grounds).

Accordingly, we hold that Appellant's complaint—that the exclusion of evidence regarding Grandfather's prior aggravated-sexual-assault conviction violated his constitutional right to prevent a complete defense—is not preserved for appellate review. We therefore overrule Appellant's first issue.

## IV. Sufficient Evidence Supports Conviction

In his fourth issue, Appellant argues that the evidence is insufficient to support a finding of guilt.[8] Appellant bases his argument on the DNA evidence, claiming that it "alone is enough for an acquittal," and also contends that there would have been "more reasonable doubt" had he been able to present "a full account and defense."

---

[8]We address Appellant's fourth issue challenging the sufficiency of the evidence next because it could afford him an acquittal. *See Prince v. State*, No. 14-23-00786-CR, 2025 WL 899853, at *2 n.2 (Tex. App.—Houston [14th Dist.] Mar. 25, 2025, pet. filed) (mem. op., not designated for publication).

Appellant's arguments ignore the standard of review that we are required to apply; applying the correct standard of review leads to a conclusion that the evidence is sufficient to support Appellant's conviction.

## A. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt.[9] *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569

---

[9]We note that Appellant argues that the State was tasked with proving the elements of the offense at trial and "failed to prove [them] beyond all reasonable doubt." Appellant misquotes the standard, which is beyond *a* reasonable doubt, not beyond *all* reasonable doubt.

S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Hammack*, 622 S.W.3d at 914. The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021); *see Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

**B.    Applicable Law**

A person commits the offense of continuous sexual abuse of a young child if

(1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and

(2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is:

> (A) a child younger than 14 years of age, regardless of whether the actor knows the age of the victim at the time of the offense . . . .

Tex. Penal Code Ann. § 21.02(b).

The indictment alleged that Appellant, in Denton County,

during a period that was 30 days or more in duration, to-wit: from on or about the 3rd day of January, 2018, through on or about the 30th day of October, 2020, did then and there commit two or more acts of sexual abuse, namely, [a]ggravated [s]exual [a]ssault of [a] [c]hild against [the complainant], to-wit: intentionally or knowingly caus[ing] the penetration of the sexual organ of [the complainant] by [Appellant's] sexual organ, and at the time of the commission of each of those acts, [Appellant] was at least 17 years of age, and [the complainant] was a child younger than 14 years of age, and not the spouse of [Appellant.]

A child complainant's testimony, standing alone, can be sufficient proof of a sexual offense. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1).

**C.    Analysis**

Here, Appellant makes general arguments that "it is clear [that] the evidence establishes reasonable doubt" and that "the evidence presented was insufficient to support a conviction by proof beyond a reasonable doubt." He does not specifically attack any of the elements of the offense. Instead, he claims that "[t]he DNA

15

evidence alone is enough for an acquittal" but provides no analysis to support that statement.

Contrary to Appellant's general contentions, the evidence presented at trial is sufficient to support every element of the offense of continuous sexual abuse of a child. The complainant testified that the first instance of sexual abuse that Appellant perpetrated on her occurred when she was in second grade and that the sexual abuse took place approximately fifteen times, and the evidence reflected that she was nine years old and in the fourth grade at the time of the October 30, 2020 offense; this evidence satisfies the duration element and demonstrates that the complainant was younger than fourteen. Appellant never challenged his age, and Mother testified that he was older than seventeen. Moreover, the complainant clearly and consistently identified Appellant as the perpetrator, and the evidence does not show that she had ever indicated that someone else had sexually abused her.

The complainant's testimony, standing alone, is sufficient to prove that she was continuously sexually abused by Appellant. *See id.* The jury was entitled to believe her testimony about what had occurred on October 30, 2020, as well as her testimony that Appellant had sexually assaulted her on multiple occasions beginning when she was in the second grade. *See Keith v. State*, No. 02-24-00034-CR, 2024 WL 4899022, at *5 (Tex. App.—Fort Worth Nov. 27, 2024, no pet.) (mem. op., not designated for publication).

Moreover, the DNA evidence that Appellant contends acquits him of the offense does no such thing. Instead, it shows that he could not be ruled out as the

16

contributor of the male DNA on the vaginal and vulval swabs taken from the complainant and that "[t]he probability of obtaining this mixture profile [from the complainant's underwear] if the DNA came from the victim[; Appellant;] and one . . . unknown individual is 4.74 million times greater than the probability of obtaining this profile if the DNA [was] from the victim and two . . . unknown individuals." Appellant was one of two males at the home at the time of the October 30, 2020 offense, and the other male—Joshua—was ruled out as a contributor when the DNA evidence from the complainant was tested against his buccal swab.

We therefore overrule Appellant's fourth issue.

## V. Exclusion of Alternative-Perpetrator Evidence

In his second issue, Appellant argues that if this court holds that his constitutional arguments in his first issue were not sufficiently preserved, then the trial court's evidentiary ruling was nonetheless erroneous.[10]    Specifically, Appellant

---

[10]Within his first and second issues complaining about his inability to present a complete defense, Appellant contends that "[w]hether the nexus requirement [from *Wiley v. State*, 74 S.W.3d 399, 406 (Tex. Crim. App. 2002),] remains viable after *Holmes* [*v. South Carolina*, 547 U.S. 319, 126 S. Ct. 1727 (2006),] is not settled."  Relying on *Holmes*, Appellant urges that only defensive evidence "that serve[s] no legitimate purpose or that [is] disproportionate to the ends that [it is] asserted to promote" can be excluded.  *Id.* at 326, 126 S. Ct. at 1732.  We disagree; this court has continued to apply the *Wiley* nexus requirement.  *See Ruiz v. State*, No. 02-19-000016-CR, 2020 WL 1173712, at *2 (Tex. App.—Fort Worth Mar. 12, 2020, pet. ref'd) (mem. op., not designated for publication) ("Before a court may admit alternative-perpetrator evidence, the defendant must show that his proffered evidence—on its own or in combination with other evidence—suffices to link the alleged crime and the alleged alternative perpetrator." (citing *Wiley*, 74 S.W.3d at 406)).  Appellant alternatively argues that even if the nexus requirement continues to exist, he met that nexus.  But

17

contends that "[t]he trial court's exclusion of defensive evidence denied [him] a full and complete defense of his life at trial" because he "was denied the opportunity to tell the jury [that] they could believe in the [complainant's] trauma but find the identity of [the] person who [had] inflicted it misplaced." Because the alternative-perpetrator defense is not applicable to the facts here and, alternatively, because the trial court did not prevent Appellant from questioning witnesses about Grandfather's access to the complainant, we conclude that the trial court did not abuse its discretion by excluding Grandfather's remote conviction.

## A. Standard of Review

We review a trial court's ruling whether to admit or exclude evidence for an abuse of discretion. *Hart v. State*, 688 S.W.3d 883, 891 (Tex. Crim. App. 2024). Under that standard, the trial court's decision to admit or exclude evidence will be upheld as long as it was within the "zone of reasonable disagreement." *Id.* (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)). If the trial court's evidentiary ruling is correct on any applicable theory of law, we will not disturb it. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

---

as detailed below, Appellant failed to demonstrate the requisite nexus between the charged crime and Grandfather as the "alternative perpetrator" where the complainant unequivocally and consistently identified solely Appellant as the perpetrator. *See Rojas v. State*, No. 08-23-00305-CR, 2024 WL 4689052, at *6 (Tex. App.—El Paso Nov. 5, 2024, no pet.) (mem. op., not designated for publication) (holding that appellant failed to demonstrate the requisite nexus between the charged crimes and the victim's father as the "alleged perpetrator" simply because he was a registered sex offender).

18

**B.     Applicable Law**

We borrow from the Beaumont Court of Appeals's opinion in *Rubino v. State*, which sets forth the law that applies when a defendant is denied the right to present a meaningful defense and when the defendant seeks to raise an alternative-perpetrator defense:

> Erroneous evidentiary rulings rarely rise to the level of denying the fundamental constitutional right to present a meaningful defense. *Potier v. State*, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002). "[T]he exclusion of a defendant's evidence will be constitutional error only if the evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Id.* at 665; *see Wiley . . .* , 74 S.W.3d [at] 405 . . . . The Court of Criminal Appeals has held that
>
>> [a]lthough a defendant obviously has a right to attempt to establish his innocence by showing that someone else committed the crime, he still must show that his proffered evidence regarding the alleged alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the alleged "alternative perpetrator."
>
> *Wiley*, 74 S.W.3d at 406. It is not sufficient if a defendant merely offers up unsupported speculation that another person may have committed the crime. *Martinez v. State*, 212 S.W.3d 411, 424 (Tex. App.—Austin 2006, pet. ref'd). Such speculation intensifies the grave risk of confusing the jury, and it invites the jury to base its findings on emotion or prejudice. *Id.*
>
> The alternative[-]perpetrator defense typically arises in cases in which the complaining witness is attacked by a stranger. *Ex parte Huddlestun*, 505 S.W.3d 646, 661 (Tex. App.—Texarkana 2016, pet. ref'd).

*Rubino v. State*, Nos. 09-15-00442-CR, 09-15-00443-CR, 2017 WL 1953275, at *3 (Tex. App.—Beaumont May 10, 2017, no pet.) (mem. op., not designated for publication).

19

*Rubino* is also factually similar to the case at hand, as shown by its alternative-perpetrator-defense analysis:

> [The victim], who was sixteen years old at the time of trial, testified that Rubino was her stepfather and that he had sexually abused her. [The victim] testified that she was seven years old when Rubino sexually abused her for the first time. [The victim] explained that Rubino [had] touched her with his penis and his hands and that he had penetrated her both vaginally and anally with his penis. [The victim] testified that Rubino would often put his penis in her mouth, and Rubino made [the victim] rub his penis with her hand. [The victim] also testified that Rubino [had taken] pictures of her when she was naked. According to [the victim], the abuse occurred a few times a week from the age of seven until she turned twelve.
>
> The record shows that [the victim] identified Rubino as the only person who had sexually assaulted her. [The victim] did not allege that she had been sexually assaulted by a stranger[] or that she was unsure of her attacker's identity. Thus, based on the facts in this case, the alternative[-]perpetrator defense is not applicable. *See . . . Huddlestun*, 505 S.W.3d at 661.

*Id.*

## C. Analysis

Here, the complainant gave consistent statements to Mother, the SANE, and the forensic interviewer regarding who the perpetrator was, and in each statement, she identified Appellant. The complainant described the sexual abuse that Appellant had perpetrated against her and testified that it had occurred from the time she was in the second grade to fourth grade. Moreover, during the October 2020 incident, only Appellant and Joshua were in the home with the complainant, and the DNA testing excluded Joshua as a contributor to the male DNA profile that was found. As in

*Rubino*, the record demonstrates that the complainant identified Appellant as the only person who had ever sexually assaulted her. Based on the facts presented, the alternative-perpetrator defense is not applicable.

Even assuming the alternative-perpetrator defense does apply, the trial court, as noted by the State, did not prohibit Appellant from advancing an alternative-perpetrator defense; it solely prohibited him from using Grandfather's criminal history to support that defense. The record demonstrates that Appellant was allowed to inquire about Grandfather's access to the children, whether he was present at the hospital, and whether he was included within the DNA test results (i.e., the DNA testing did not exclude Appellant's paternally related male relatives, such as Grandfather). And during the defense's closing argument, Appellant asserted, "It could be the grandfather." Appellant then pointed out that "[t]here's family interaction of [G]randmother, [G]randfather, . . . Joshua . . . , [and Appellant] with the children. I ask you to take all of that into consideration when you're examining and giving thoughts to the DNA, how does that fit in?" Appellant later reiterated that the "DNA evidence fits all [of Appellant's] paternal line" and that "Grandfather and [Grandmother] are in the picture and active in these children's [lives]." Appellant thus failed to demonstrate that the trial court abused its discretion by excluding Grandfather's remote conviction as part of Appellant's alternative-perpetrator evidence. *See Rojas*, 2024 WL 4689052, at *6 (holding that appellant failed to

21

demonstrate that the trial court abused its discretion by excluding the CPS evidence as part of appellant's alternative-perpetrator evidence).

We overrule Appellant's second issue.

## VI. Failure to Bring Forward a Record to Support Search-Warrant Challenge

In his third issue, Appellant argues that the trial court committed error when it denied his motion to suppress DNA evidence that was obtained based on an allegedly invalid search warrant. Appellant contends that "[a]ccording to the [m]otion to [s]uppress, the search warrant stated [that he] could be found in Tarrant County" and that "[t]his is problematic" because he was located in Denton County when the search warrant was obtained. Appellant acknowledges that the search-warrant affidavit is not in the record and argues that because the affidavit is not available, this court should reverse the trial court's motion-to-suppress decision. Appellant's argument ignores that it was his burden to bring forth a sufficient record to support his search-warrant challenge.

### A.    Applicable Law

Just as in *Ali v. State*, a prior decision from this court,

[c]ritical to the resolution of this appeal are the burdens of proof that apply in a motion to suppress when the State has shown that a warrant is in existence. Simply,

> "[o]nce the State shows that a valid search warrant is in existence at the time of the search[,] the burden of going forward is then on a defendant to prove that the affidavit is insufficient as a matter of law and to see that the search warrant and the affidavit are included in the record on appeal." *Ortega v. State*, 464 S.W.2d 876, 877 (Tex. Crim. App. 1971); *see Underwood v. State*, 967 S.W.2d 925, 927–28

22

(Tex. App.—Beaumont 1998, pet. ref'd); [*see also*] *Davidson v. State*, 249 S.W.3d 709, 717–18 (Tex. App.—Austin 2008, pet. ref'd) (it is defendant's burden to establish warrant's invalidity).

*Rudd v. State*, No. 06-13-00034-CR, 2013 WL 5866057, at *6 (Tex. App.—Texarkana Oct. 28, 2013, no pet.) (mem. op., not designated for publication) (footnote omitted).

The State meets its burden to establish the existence of a warrant by exhibiting the warrant to the trial court, and if the appellant wishes to challenge the validity of the warrant, it falls on him to include the warrant in the record. As the First Court of Appeals has noted,

> "When a defendant objects to the court['s] admitting evidence on the ground that it was unlawfully seized and the State relies on a search warrant, in the absence of a waiver, reversible error will result unless the record reflects that the warrant was exhibited to the trial judge." *Cannady v. State*, 582 S.W.2d 467, 469 (Tex. Crim. App. [Panel Op.] 1979); *see Miller v. State*, 736 S.W.2d 643, 648 (Tex. Crim. App. 1987)[ (op. on reh'g)] . . . (holding that once warrant and supporting affidavit are produced by State and exhibited to trial court, it is the responsibility of the defendant to see that the warrant and the supporting affidavit are in the record if they are to be reviewed on appeal). "[I]f defense counsel desires a review of the search warrant and affidavit on appeal, it is necessary for him to offer for the record on a bill of exception copies of the search warrant and of the affidavit." *Cannady*, 582 S.W.2d at 469.

*Boldon v. State*, No. 01-12-00486-CR, 2013 WL 5637031, at *7 (Tex. App.—Houston [1st Dist.] Oct. 15, 2013, pet. ref'd) (mem. op., not designated for publication).

No. 02-21-00205-CR, 2022 WL 2353093, at *2 (Tex. App.—Fort Worth June 30, 2022, no pet.) (mem. op., not designated for publication).

**B.    What the Record Shows**

The record reflects that the trial court took up the motion to suppress after voir dire was completed. The trial court noted that it had received the search-warrant affidavit and the search warrant. The trial court stated on the record that it had read the motion to suppress and that it was denying the motion. The trial court further stated that it found the search warrant to be lawful. None of the documents were admitted during the hearing.

**C.    Analysis**

Here, Appellant challenges the wording of the search warrant because it referenced a county in which he was not located, and he questions whether the affidavit provided additional information to help locate him. But the record does not include the search warrant or the affidavit, even though both were exhibited to the trial court and the trial court concluded that the search warrant was lawful. After the trial court stated that it had read the motion and had "looked at this [possibly the search warrant and/or affidavit,]" the trial court asked, "Anything else anybody wants to add or argue?" Appellant's counsel responded, "I think the motion speaks for itself, Your Honor." He did not attempt to offer the search-warrant affidavit and the search warrant into evidence.

Because Appellant has failed in his burden to bring forward a record that enables us to review the trial court's determination, we are left without any means to determine whether the trial court was correct in its view that the search warrant was

24

lawful. *See id.* at *4; *see also Moreno v. State*, 858 S.W.2d 453, 461 (Tex. Crim. App. 1993) (stating that "the appellate record shows that the affidavit in question was not made a part of the record" and that "[w]ithout the affidavit[,] we are not in a position to review the merits of appellant's complaints"); *Washington v. State*, Nos. 14-23-00723-CR, 14-23-00724-CR, 14-23-00725-CR, 2025 WL 926468, at *4 (Tex. App.—Houston [14th Dist.] Mar. 27, 2025, no pet.) (mem. op., not designated for publication) (stating that appellant had the responsibility to ensure that the warrant and affidavit were included in the appellate record and holding that because the affidavit did not appear in the record, appellant had failed to preserve any alleged error for review).

Accordingly, we overrule Appellant's third issue.

## VII.  Conclusion

Having overruled Appellant's four issues, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  June 19, 2025

25